JOSÉ LUIS LÓPEZ y FEDERACIÓN DE COMERCIANTES UNIDOS DEL VIEJO SAN JUAN, demandantes; ESTADO LIBRE ASOCIADO DE PUERTO RICO, interventor, demandante y recurrido, *v.* MUNICIPIO DE SAN JUAN, demandado y recurrente.

*Número:* RE-88-40 *Resuelto:* 21 de abril de 1988

76

78

*Alex González, Alberto J. Pérez Hernández* y *Juan J. Vilella Janeiro,* de *González & Pérez-Hernández,* abogados del recurrente; *Rafael Ortiz Carrión, Procurador General,* abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

El 5 de junio de 1986 el Alcalde de San Juan, Lic. Baltasar Corrada del Río, mediante orden administrativa —y por un período de 26 días— limitó el acceso de vehículos del público en general en ciertos tramos de las calles San Francisco y Fortaleza en el Viejo San Juan, los cuales designó como paseos peatonales.(1) El 2 de julio extendió esta orden por 30 días adicionales.

El 14 de julio la Asamblea Municipal aprobó la Ordenanza Núm. 1, Serie 1986–87, 0535A, que establecía permanentemente el "Plan de Reorganización de Tránsito Vehicular y Flujo Peatonal en el Viejo San Juan". El Alcalde la refrendó el 15 de agosto.

Esta reglamentación forma parte de un proyecto de obras urbanísticas de mayor envergadura conocido como "San Juan Abre Sus Puertas" o "San Juan Peatonal". Afecta el carácter y ambiente en general de la zona antigua e histórica de San Juan, pues aparte del tránsito "incluye diversas obras y actuaciones en la zona histórica del Viejo San Juan como el cierre de calles; el arrendamiento privado de vías públicas, aceras y espacios en plazas para actividades artísticas y culturales; la instalación de mobiliario; habilitación de áreas sobre las aceras y calles para la ubicación de negocios

_____

(1) Quedaron exentos los vehículos de transportación colectiva interna del proyecto "San Juan Abre Sus-Puertas", los de transporte público, los de servicio y emergencia, y los de carga y descarga durante el horario de 6:00 A.M. a 10:30 A.M.

al aire libre tales como cafés, y venta de flores, la instalación de plataformas de extensión de las aceras, la provisión de espacios en áreas públicas para el arrendamiento de negocios privados dedicados a la preparación, venta y servicio de comidas y bebidas; la provisión de paseos peatonales, áreas de estacionamiento de vehículos y otros controles de tránsito vehicular y peatonal. Otras actuaciones relacionadas con el indicado programa incluyen además el pintado de líneas amarillas sobre adoquines de las calles; sembrado de postes metálicos en aceras; restauraciones de las Plazas de Armas, de Colón y San José y mejoras de otras; la construcción de un elevador panorámico; la construcción de un terminal de vehículos; la instalación de toldos de cafés al aire libre, de materos, plataformas y tiestos. (Véase la Ordenanza Núm. 1 y la Declaración Jurada del Sr. Elías López Sobá, Director Ejecutivo del Instituto de Cultura Puertorriqueña del 28 de octubre de 1966)".[2]

Al momento de aprobarse la ordenanza, al amparo del Art. 204 de la Ley Orgánica de los Municipios, 21 L.P.R.A. sec. 2054, y el Art. 4 de la Ley de Vehículos y Tránsito de Puerto Rico, 9 L.P.R.A. sec. 1703, los municipios estaban facultados a reglamentar, con sujeción a ciertos requerimientos, el tránsito en las calles y vías públicas dentro de sus límites geográficos. En cuanto a otras obras municipales en zonas históricas y turísticas, la Ley de Zonas Antiguas Históricas —Ley Núm. 374 de 14 de mayo de 1949— en lo pertinente disponía:

—*Aprobación de planos; normas*

La Administración de Reglamentos y Permisos, a los fines de las secs. 161 a 166 de este título y en adición a sus otras obligaciones y deberes, *dictaminará* sobre la propiedad de *todos y cada uno de los aditamentos (incluyendo rótulos),*

_____

[2] Sentencia del Tribunal Superior, Sala de San Juan, de 29 de diciembre de 1987. Anejo 8, págs. 28–29.

*rasgos arquitectónicos, color, y demás características de cualquier edificación, estructura, pertenencia o parte de la misma que, a partir de la vigencia de esta ley, desee erigirse, reconstruirse, ampliarse, alterarse, restaurarse, demolerse, o en cualquier modo desarrollarse dentro de cualquier zona antigua o histórica o de interés turístico.* En ambos casos, dicho dictamen deberá incluir el uso a que se destina la propiedad, debiendo contar la Administración de Reglamentos y Permisos en los *casos de interés turístico, con el endoso de la Compañía de Turismo, y en los casos en zonas antiguas o históricas con el endoso del Instituto de Cultura Puertorriqueña.* (Énfasis suplido.) 23 L.P.R.A. sec. 162.(³)

---

(³) Esta ley, según enmendada en los años 1972 y 1975, en lo atinente, en sus Arts. 1 y 3 dispone:

*"Con el propósito de preservar los valores históricos de Puerto Rico y desarrollar el turismo mediante la conservación y protección de especiales lugares y estructuras, y mediante la planificación armoniosa de la construcción de nuevas estructuras,* por la presente se dispone que *toda solicitud de permiso de construcción, permiso de uso, o cualquier otra solicitud de permiso que se radique ante la Administración de Reglamentos y Permisos para realizarse dentro de* los límites de una zona antigua o histórica o dentro de los límites de una zona de interés turístico *ha de ser previamente realizada y autorizada* en cuanto a sus *detalles,* rasgos *arquitectónicos y apropiada relación con el carácter de tal zona,* en la forma más adelante dispuesta y conforme a las demás leyes aplicables.

"En el caso de una zona antigua o histórica la Administración de Reglamentos y Permisos requerirá la recomendación favorable del Instituto de Cultura Puertorriqueña, antes de autorizar cualesquiera permisos de construcción o de uso." (Énfasis suplido.) 23 L.P.R.A. sec. 161.

. . . . . . . . .

"Es una zona antigua o histórica un área dentro de la cual los *edificios, estructuras, pertenencias y lugares son de básica y vital importancia para el desarrollo cultural y del turismo por la asociación de los mismos con la historia; por su peculiar estilo colonial español, incluyendo color, proporciones, forma y detalles arquitectónicos; por ser parte o relacionarse con una plaza, parque o área cuyo diseño o disposición general debe conservarse y/o desarrollarse acorde a determinado plan basado en motivos o finalidades culturales, históricas o arquitectónicas en general.*

. . . . . . . . .

"A partir de la vigencia de esta ley y con el fin de *preservar el carácter de las zonas antiguas o históricas, y de las zonas de interés turístico, será necesario obtener autorización de la Administración de Reglamentos y Permisos para la construcción, reconstrucción, alteración, ampliación, traslado o demolición parcial o total, de cualquier edificio dentro de las áreas comprendidas en las zonas antiguas o históricas,* y de las zonas de interés turístico, a tenor con el

El 4 de agosto, un grupo de comerciantes representados por la Federación de Comerciantes Unidos del Viejo San Juan impugnó la Ordenanza Núm. 1 en el Tribunal Superior, Sala de San Juan. El 5 de diciembre intervino el Estado Libre Asociado para cuestionarla también y pidió que se ordenara al municipio cesar de implantar el proyecto "San Juan Peatonal".

El 14 de octubre, el tribunal denegó una solicitud para que interlocutoriamente se dejara sin efecto la ordenanza. Concluyó que la reglamentación establecida no constituía un cierre permanente de calles, según provisto en el Art. 12.07 de la Ley Orgánica de los Municipios, 21 L.P.R.A. sec. 3457.(4)

Subsiguientemente acaecieron varios incidentes procesales. El 5 de noviembre de 1987, mediante sentencia parcial, se desestimó la acción de la Federación de Comerciantes. Mientras tanto, entró en vigor la Ley Núm. 8 el 10 de octubre de 1987 (23 L.P.R.A. sec. 161 *et seq.*), que enmienda la Ley Núm. 374 de 14 de mayo de 1949, *supra*. Según su historial, la Ley Núm. 8, *supra*, fue una reacción de la Asamblea Legislativa a proyectos y programas análogos al "San Juan Peatonal", con el objetivo de preservar las zonas antiguas o históricas del país y conferir a la Junta de Planificación autoridad expresa para intervenir en lo relativo al *tránsito vehicular* y los proyectos de ese tipo en esas zonas. En su Exposición de Motivos se consigna el propósito de "estable-

procedimiento que por las secs. 161 a 166 de este título o reglamento se establezca." (Énfasis suplido.) 23 L.P.R.A. sec. 163.

(4) En lo pertinente establece:

"El municipio podrá . . . efectuar el cierre permanente de cualquier calle o camino dentro de sus límites territoriales, previa celebración de vista pública . . . .

. . . . . . . . . .

"Se autoriza a los municipios a vender, eximiendo del requisito de pública subasta, los senderos o pasos para peatones existentes en las urbanizaciones, a los colindantes de dichos senderos o pasos para peatones. Dicha venta estará sujeta al procedimiento establecido en el párrafo anterior." 21 L.P.R.A. sec. 3457.

cer los mecanismos necesarios para que los organismos gubernamentales encargados de administrar esta ley *puedan evaluar los proyectos que se desarrollen en estos lugares y requerir las modificaciones o cambios que sean indispensables para asegurar la preservación de estas zonas.* Se establece, además, claramente que el foro con jurisdicción *para revisar actuaciones de los organismos administrativos pertinentes, al amparo de dicha ley* lo constituye el Tribunal Superior, Sala de San Juan o la Sala de ese Tribunal correspondiente al lugar donde ubiquen dichas zonas". (Énfasis suplido.) 23 L.P.R.A. sec. 163.

En vista de esa nueva legislación, el municipio y el Estado acordaron solicitar al foro de instancia para que decidiera sobre su aplicabilidad al caso. Oportunamente, éste dictó sentencia contra el municipio. Resolvió que el proyecto peatonal "San Juan Abre Sus Puertas" estaba sujeto a la Ley Núm. 8, *supra,* y ordenó —efectivo el 15 de febrero de 1988— la suspensión de los efectos de la Ordenanza Núm. 1 hasta que el municipio obtuviera los permisos correspondientes de la Junta de Planificación. En síntesis, el foro judicial determinó que la conservación y mantenimiento de las zonas históricas y turísticas constituía materia ocupada por el Estado y que el municipio no podía legislar en forma contraria.

■ Inconforme, el municipio recurrió ante nos para alegar que la Ley Núm. 8, *supra,* representaba —en su aplicación retroactiva— una intervención indebida del Estado en la autonomía municipal, infringía el debido proceso de ley y era un menoscabo de obligaciones contractuales según la Constitución. El 28 de enero de 1988, en auxilio de nuestra jurisdicción, paralizamos los efectos de ese dictamen. Oportunamente expedimos el auto y concedimos a las partes término para alegatos simultáneos. El 8 de febrero compareció en escrito separado, en calidad de *amicus curiae,* la Asam-

blea Municipal. Ordenamos que se uniera a los autos dicha comparecencia.(5) El 9 de marzo el Estado presentó su alegato en conjunto con una moción donde nos pide que modificáramos y acláraramos la resolución de paralizar los efectos de la sentencia. Esta última solicitud la reiteró el pasado 9 de abril. Por estar esta solicitud inextricablemente unida a los planteamientos principales del caso, en buena metodología adjudicativa, optamos por resolver el recurso en sus méritos.

## II

El Art. VI, Sec. 1 de nuestra Constitución, L.P.R.A., Tomo 1, concede facultad a la Asamblea Legislativa para "crear, suprimir, consolidar y reorganizar municipios, modificar sus límites territoriales *y determinar lo relativo a su régimen y función*". (Énfasis suplido.) Véase *Colón v. Municipio de Guayama*, 114 D.P.R. 93 (1983). Al amparo de este poder, la Asamblea Legislativa aprobó la Ley Orgánica de los Municipios, 21 L.P.R.A. seç. 2001 *et seq.* Esta ley creó a los municipios como entidades jurídicas y políticas, y dispuso lo relativo a sus estructuras, facultades, deberes y funciones. *American Express Co. v. Mun. de San Juan*, 120 D.P.R. 339 (1988).

Desde esta perspectiva panorámica, nuestro ordenamiento jurídico recoge principalmente la visión legislativa que propugna que las municipalidades son entidades de exclusiva creación legislativa o criaturas del Estado. E. Córdova, *Curso de Gobierno Municipal*, Río Piedras, Ed.

---

(5) Como recurso de revisión separado, la comparecencia de la Asamblea Municipal es improcedente. En acciones de esta naturaleza, en que se cuestiona una ordenanza, es el municipio —como ente total, integrado y verdadera parte— el que tiene la capacidad de demandar y ser demandado. En esas acciones no es necesario emplazar individualmente a los miembros de la Asamblea Municipal. Por mandato de ley, el municipio es representado, como en el caso de autos, por su Alcalde. 21 L.P.R.A. sec. 1255.

U.P.R., 1964, pág. 38; C. Ramos de Santiago, *El Gobierno de Puerto Rico*, 2da ed. rev., Río Piedras, Ed. U.P.R., 1979, pág. 706.(6)

■ La intención de la Asamblea Constituyente al aprobar el Art. VI, Sec. 1 de nuestra Constitución, *supra*, fue mantener, esencialmente, las mismas facultades que poseía la Asamblea Legislativa bajo la Ley Jones sobre los gobiernos municipales, que concedía control sobre sus poderes de regular la autonomía operacional.(7) Con ello se descartó

---

(6) La facultad constitucional de conferir poder a las entidades municipales tiene sus antecedentes en la Sec. 37 de la Ley Jones. Disponía:

"La autoridad legislativa estatuida por la presente, se aplicará a todos los asuntos de carácter legislativo que no sean localmente inaplicables, incluyendo la facultad de crear, consolidar y reorganizar los municipios, según fuere necesario, y proveer y derogar leyes y ordenanzas para los mismos; *y también la facultad de alterar, reformar, modificar o derogar cualquiera o todas las leyes y ordenanzas, de cualquier clase, actualmente vigentes en Puerto Rico o en cualquier municipio* o distrito del mismo, hasta donde dicha alteración, reforma, modificación o derogación fuere compatible con las disposiciones de esta Ley.

"No se creará por la Asamblea Legislativa ningún departamento ejecutivo no provisto por esta Ley; pero la Asamblea Legislativa podrá consolidar departamentos, o suprimir cualquier departamento, con el consentimiento del Presidente de los Estados Unidos." (Énfasis suplido.) Documentos Históricos, L.P.R.A., Tomo 1, ed. 1982, págs. 124–125.

(7) En el Informe de la Comisión de Disposiciones Transitorias y Asuntos Generales sobre Asuntos Generales —con relación a la medida propuesta— se dijo lo siguiente:

"El propósito de esta sección es señalar con la mayor claridad que el poder del Estado Libre Asociado de Puerto Rico para estructurar el sistema municipal, lo delega en la Asamblea Legislativa de Puerto Rico. *Los municipios son y serán criaturas jurídicas de la Asamblea Legislativa.* La sección comprende tres aspectos fundamentales, a saber:

"(a) La facultad de la Asamblea Legislativa para crear, consolidar y reorganizar municipios, modificar sus límites territoriales y determinar lo relativo a sus funciones y régimen.

"(b) La facultad de la Asamblea Legislativa para autorizar a los municipios a desarrollar programas de bienestar general.

"(c) La limitación que se señala a la Asamblea Legislativa para que, cuando ejercite la facultad de abolir, o de fusionar o consolidar municipios, venga obligada a consultar directamente a los electores de los municipios concernidos.

"Analicemos cada aspecto separadamente.

una propuesta de mayor autonomía municipal. 3 Diario de Sesiones de la Convención Constituyente 2040, 2046 (1952); J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, pág. 215. La disposición constitucional aprobada, aunque ha sido objeto de críticas, no reconoce ningún grado de autonomía a los municipios.[8] Como se ha señalado, esta ausencia de autonomía local puede plantear situaciones donde se vulneren nuestros valores democráticos. Ramos de Santiago, *op. cit.*, pág. 705.

■ No obstante la prevalecencia de este enfoque clásico constitucional —que subraya la preeminencia de la Asam-

---

"(a) [*Crear, consolidar, etc.*] La Asamblea Legislativa de Puerto Rico debe tener la facultad de crear, consolidar y reorganizar los municipios y modificar sus límites territoriales y determinar por ley lo relativo a sus funciones y régimen. *Las necesidades económicas de Puerto Rico aconsejan que continuemos el mismo sistema que existe hasta el presente.* Los municipios podrán desarrollarse como hasta ahora, pero sujetos siempre a que la Asamblea Legislativa, teniendo en consideración el bienestar general de la Isla, pueda determinar por ley aquello que estime aconsejable." (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2615, 2618 (1952).

[8] "Hay que mencionar todavía otra cuestión básica muy principal para la tarea constituyente en Puerto Rico: el problema de crear las estructuras necesarias para el crecimiento de autonomía local efectiva. Bajo las leyes orgánicas, este pre-requisito esencial de toda democracia genuina y eficaz ha permanecido descuidado. Ha existido una super concentración de poder y autoridad en el centro. Por eso ha debido fijarse constitucionalmente una esfera de genuina autonomía local, como se la encuentra en todos los estados de la Unión Norteamericana. Esa autonomía local no necesita menoscabar la eficiencia administrativa, sino que puede ser una importante ayuda para ella, si se la maneja con cuidado. La experiencia de los estados norteamericanos suministra varios modelos prácticos que pueden ser adaptados a las condiciones de Puerto Rico. En todo caso, debe establecerse una estricta supervisión financiera sobre las autoridades locales. Muchos ciudadanos aprenden a participar eficazmente en los asuntos públicos comenzando por el nivel local, y las ciudades, municipios y condados de gobierno autónomo han sido llamados con razón en Estados Unidos la 'Escuela de la Democracia'. Esto debe ser particularmente cierto en un país con mucho analfabetismo. Por desgracia, la Convención Constituyente de Puerto Rico —artículo VI, sección 1— ha perpetuado el sistema de control completamente centralizado, en lugar de garantizar la autonomía del gobierno local. Esta es la más seria falla de la nueva Constitución." *La Nueva Constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954, págs. 24-25.

blea Legislativa sobre los municipios— nuestro ordenamiento, por imperativo circunstancial, ha reconocido la facultad municipal de reglamentar el tránsito y el estacionamiento en sus vías públicas como parte del ejercicio del poder de razón de Estado. *Salas v. Municipio de Moca*, 119 D.P.R. 625 (1987); *Pueblo v. Miranda*, 56 D.P.R. 601 (1940); *El Pueblo v. Padilla*, 20 D.P.R. 276 (1914).

> La regulación del tránsito constituye otra preocupación fundamental del gobernante de una ciudad moderna. El número creciente de vehículos de motor, la congestión de las vías públicas y el aumento alarmante del índice de accidentes, le impone la necesidad de establecer medidas encaminadas a facilitar la circulación y a exigir se adopten por automovilistas y peatones las precauciones indispensables. Se trata, fuera de toda duda, de una actividad de policía que entra naturalmente dentro del área de competencia del municipio. . . . Y de ahí el gran número de ordenanzas municipales que se relacionan con la reglamentación de cuáles calles son de una sóla o de dos direcciones, cuáles son las velocidades autorizadas, cuáles los sitios permitidos de estacionamiento, en qué forma habrán de usarse las bocinas o las luces, etc. Córdova, *op. cit.*, pag. 378.

Sin embargo, este poder de regular el tránsito no es absoluto. Está sujeto al poder más amplio del Estado y a las áreas en que éste ocupe determinado campo. Así, toda ordenanza municipal regulatoria tiene que estar en armonía con el ordenamiento estatal, el cual ha de prevalecer en situaciones conflictivas. Córdova, *op. cit.*, págs. 373–374; Reynolds, *Local Government & Law*, 1982, pág. 20. A tal efecto, en *Cabassa v. Rivera*, 68 D.P.R. 706, 712 (1948), resolvimos que una "ordenanza municipal no puede, por supuesto, estar en pugna con las leyes de nuestra Asamblea Legislativa. Sin embargo, cuando en el ejercicio de su poder de policía tanto el estado como un municipio tratan de reglamentar determinada materia, la ordenanza se considerará válida a menos que sea imposible armonizarla con la ley general". En *Vélez*

*v. Municipio de Toa Baja*, 109 D.P.R. 369, 374–375 (1980), reiteramos así este enfoque:

[A]un en asuntos de naturaleza municipal, la Asamblea Municipal no tiene autoridad para intervenir cuando la Asamblea Legislativa ha ocupado el campo. C.J. Antieau, *Municipal Corporation Law*, Vol. 1, sec. 2A.27 (1979).

La intención de la Asamblea Legislativa de reglamentar la materia puede constar expresamente en la legislación estatal o puede deducirse de la naturaleza de ésta al establecer un plan o esquema detallado que abarcadoramente lo reglamente todo, demostrando la intención de ocupar el campo para sí. El que un estatuto en particular o un grupo de estatutos sean suficientemente abarcadores para demostrar que ha habido una intención de ocupar el campo, ciertamente no puede determinarse a base de una norma preestablecida. Cada caso en particular hay que considerarlo por sus propios méritos. En *People* v. *Llewellyn*, 237 N.W. 2d 902, 905 (Mich. 1977), *cert.* den. *City of East Detroit* v. *Llewellyn*, 435 U.S. 1008 (1978), se especifican las normas que usualmente deben tenerse en cuenta para determinar si el Estado ha ocupado el campo, a saber:

"Primero, donde la ley estatal dispone expresamente que la autoridad del estado para reglamentar determinada materia es exclusiva, resulta claro que el estado ha ocupado el campo. [Citas omitidas.]

Segundo, la intención de la Asamblea Legislativa de ocupar el campo puede constar implícitamente en el historial legislativo de la ley. [Citas omitidas.]

Tercero, la existencia de un esquema de reglamentación estatal abarcador podría apoyar una conclusión de que el estado ha ocupado el campo. [Citas omitidas.] Aunque la existencia de un esquema de reglamentación estatal abarcador generalmente no es suficiente de por sí para inferir la ocupación del campo, es un factor que debe considerarse como evidencia de la ocupación del campo.

Cuarto, la naturaleza de la materia reglamentada puede exigir reglamentación estatal exclusiva para lograr la uniformidad necesaria para cumplir los propósitos o intereses del estado."

█ A tenor con los principios expuestos, es evidente que los municipios puedan reglamentar el tránsito en las calles y vías públicas bajo su jurisdicción, *siempre que no exista conflicto* con la Ley de Vehículos y Tránsito de Puerto Rico, 9 L.P.R.A. sec. 1703, y claro está, *con otros estatutos en vigor*. Este esquema, en interacción con ciertas disposiciones constitucionales y legales, es determinante para la fiel solución del recurso. Expongámoslas.

## III

█ El Art. VI, Sec. 19 de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 379, en lo pertinente, proclama la importancia de nuestro patrimonio cultural e histórico y consigna como "política pública del Estado Libre Asociado . . . la conservación y mantenimiento de los edificios y lugares que sean declarados de valor histórico o artístico por la Asamblea Legislativa". Desde esta visión —recogida inicialmente por la Asamblea Legislativa mediante la Ley Núm. 374 de 14 de mayo de 1949 antes transcrita— el Estado ocupó el campo referente a toda determinación de las zonas históricas y encomendó a la Junta de Planificación, en coordinación con el Instituto de Cultura Puertorriqueña, implantar dicha política pública mediante la delimitación y reglamentación de dichas zonas. A tenor con ese mandato, la Junta de Planificación, desde el 28 de marzo de 1951, mediante la Resolución Z–7, delimitó al San Juan antiguo como zona histórica. El 26 de mayo de ese año adoptó y promulgó el Reglamento de Planificación Núm. 5, posteriormente enmendado, *sobre Zonas Antiguas e Históricas*. Por su pertinencia reproducimos varias de sus disposiciones más importantes:

> En su interpretación de la ley . . . la Junta tomará en consideración que la zona antigua e histórica debe ser un *área viviente* de la ciudad donde se presume que los usos normales existentes han de continuar y donde el desarrollo de usos

nuevos y especiales deberán ser estimulados. *Se propone mantener un ambiente* en el cual se estabilicen los valores de las propiedades, y se atraiga capital nuevo e inversiones, especialmente para actividades turísticas o relacionadas con el turismo. (Énfasis suplido.) 23 R.&R.P.R. sec. 162-3.

. . . . . . . . .

Una vez establecida la zona antigua e histórica, el propósito primordial en la interpretación y administración de la Ley . . . será lograr que tanto las fachadas de los edificios y estructuras así como el interior, reparto y otras características de los mismos estén *en armonía con los estilos existentes en dicha zona.* (Énfasis suplido.) 23 R.&R.P.R. sec. 162-5.

. . . . . . . . .

La Junta decidirá sobre *la adaptabilidad de cualquier proyecto* de construcción, reconstrucción, destrucción, reparación, cambio, o pintura de cualquier edificio, estructura, pertenencia, o parte de los mismos, incluyendo el diseño, la forma, material, color, estilo arquitectónico y características tales como rótulos, detalles arquitectónicos y otros. Considerará también *su relación con las características de edificios* cercanos y de la vecindad en general. (Énfasis suplido.) 23 R.&R.P.R. sec. 162-6.

▮ Además, el Art. 7 de dicho Reglamento provee la renovación y reinstalación de líneas eléctricas o de comunicación a base de que las obras a realizarse se hagan de tal manera que estén *en armonía* con el *carácter* de la *Zona* Antigua e Histórica, *"o sea, que no conflija con la apariencia o el ambiente general de la misma".* 23 R.&R.P.R. sec. 162-8.

▮ De toda esta legislación y reglamentación surge que la política pública constitucional —según visualizada por la Asamblea Legislativa e implantada por la Junta de Planificación, aun antes de aprobarse la Ley Núm. 8, *supra*— con excepción del tránsito, cubre no sólo los edificios y sus pertenencias, sino plazas, parques y aquellas otras áreas corres-

pondientes de mantener el *ambiente* y *características* de una *zona histórica*.

■ Difícilmente es armonizable la preservación de una zona histórica si su ambiente y características incidentales físicas no compaginan. Debe prevalecer el espíritu de los siglos. Una zona histórica es la suma total de todas las partes que componen el medio ambiente.

■ A partir de este mandato y diseño legislativo, las obras antes enumeradas y aquellas consignadas en el "Listado de Proyectos de Mejoras Capitales – San Juan Abre Sus Puertas" —de 12 de enero de 1988— requieren permiso previo o dispensa de la Junta o de A.R.P.E., previo el endoso del Instituto de Cultura Puertorriqueña o de la Compañía de Turismo, en los casos correspondientes. Este estado de derecho opera desde antes de la Ley Núm. 8, *supra*.

## IV

■ A su vez, según antes hemos indicado, preocupada por el impacto que sobre esa zona previamente ocupada conllevaba el plan municipal de "San Juan Abre Sus Puertas", la Asamblea Legislativa aprobó la Ley Núm. 8, *supra*, que requiere someter a la Junta de Planificación, o a la Administración de Reglamentos y Permisos, cualquiera acción modificativa del *tránsito* en zonas históricas o de interés turístico. En lo pertinente, el estatuto establece:

Artículo 6.—

En armonía con lo dispuesto en esta ley, *no podrá implantarse sin la previa aprobación de la Junta de Planificación o de la Administración de Reglamentos y Permisos, según corresponda*, acción alguna en una zona antigua o histórica o en una zona de interés turístico *que modifique el tránsito* o altere los edificios, estructuras, pertenencias, lugares, plazas, parques o áreas de la zona por parte de personas particulares o agencias gubernamentales, incluyendo los municipios. La

agencia pertinente no podrá aprobar ninguna de las acciones señaladas sin contar con el previo endoso favorable por escrito del Instituto de Cultura Puertorriqueña, en el caso de una zona antigua o histórica y de la Compañía de Turismo, en el caso de una zona de interés turístico.

*Para aquellas acciones de la naturaleza señalada en el párrafo anterior que hayan sido implantadas previo a la aprobación de esta ley o se implanten en el futuro*, la Junta de Planificación, motu proprio, con el asesoramiento del Instituto de Cultura Puertorriqueña en el caso de zonas antiguas o históricas y de la Compañía de Turismo en [el] caso de zonas de interés turístico, o a petición de cualquiera de dichas agencias o de cualquier funcionario, organismo o persona interesada, *podrá iniciar la investigación* correspondiente *para determinar si la acción de que se trata está conforme a los propósitos y fines de esta ley*. La Junta de Planificación podrá requerir la información necesaria de todas las fuentes que estime pertinente, ofrecerá un término razonable a las partes para expresarse sobre la información recibida o generada y podrá celebrar vista administrativa o audiencia pública para recibir información en los casos que estime necesario. *Luego de evaluada la información y evidencia obtenida*, la Junta de Planificación podrá ordenar, entre otras cosas, la paralización de la implantación de la acción de que se trate y la restitución de la zona a su estado original, requerir la modificación de la acción implantada o implantándose, o condicionar la continuación de la implantación de la acción al cumplimiento de los requisitos pertinentes para garantizar los propósitos y fines de esta ley.

*Cualquier parte afectada por la determinación de la Junta de Planificación o de la Administración de Reglamentos y Permisos podrá recurrir en revisión al Tribunal Superior, a tenor con lo dispuesto en el Artículo 5 de esta ley*. (Énfasis suplido.) 1987 Leyes de Puerto Rico 1029–1030.

▬▬ Se observa, pues, que la Ley Núm. 8, *supra*, constituyó un ejercicio válido de la Asamblea Legislativa apuntalado en el poder que se le delegó, conforme con la Constitución, para reglamentar —por su valor social y bienestar público— las áreas que forman parte de nuestro pa-

trimonio histórico y cultural, *incluso el tránsito*. Hasta ese momento los municipios tenían poder genérico para reglamentar el tránsito de las vías públicas dentro de sus límites. Con la Ley Núm. 8, *supra*, ello quedó limitado. Ahora, se exige la aprobación de la Junta de Planificación para cualquier acción a "implantarse" modificativa del tránsito en una zona histórica o turística. No obstante, advertimos que el nuevo estatuto no dispone que cualquier acción sobre el tránsito implantada legalmente antes de la aprobación del estatuto quede *automáticamente sin efecto*. Para cubrir estas últimas —acciones antes de su aprobación— la única autorización legislativa es que sean evaluadas por la Junta de Planificación quien, luego de realizar los correspondientes estudios, podrá ordenar la paralización, restitución al estado original, modificación, o condicionar su continuación al cumplimiento de ciertos requisitos.

Resolvemos, pues, que la Ley Núm. 8, *supra*, aplica a las acciones implantadas antes de su aprobación. Ahora bien, su efectividad dependerá del proceso previo de evaluación por la Junta de Planificación. De acuerdo con este enfoque, el Legislador salvó inicialmente toda objeción fundada en su retroactividad. En este sentido es correcta la sentencia del ilustrado tribunal de instancia con respecto a la facultad del Estado para reglar asuntos de interés público, sin infringir la autonomía municipal. "[L]os gobiernos municipales operan no como un mero instrumento de función local o privado, sino como un organismo de gobierno y elemento de coordinación dentro de la esfera gubernamental del Gobierno de Puerto Rico. Sobre este tema, véase, Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, Vol. 1, págs. 267–274; *Cast[le] Enterprises, Inc.* v. *Registrador*, 87 D.P.R. 775, 780 (1963); *Pa[m]blanco* v. *Union*

*Carbide*, 90 D.P.R. 712, 721 (1964); *Pou Estape* v. *F. S. E.*, 108 D.P.R. 336, 340 (1979); *Piñeiro* v. *C.R.U.V.*, 106 D.P.R. 300, 302 (1977); *E.L.A.* v. *Mercado Carrasquillo*, 104 D.P.R. 784, 789 (1976). Les está vedado excederse de la facultad concedida por ley en sus funciones o actuaciones administrativas, las cuales deberán estar en armonía con la ley y ninguna ordenanza municipal puede ir por sobre claras e inequívocas disposiciones constitucionales o legislativas." *Exhibit* O, págs. 126–127.

Lo expuesto no milita totalmente en contra del Municipio de San Juan. Es obvio que, en virtud del transcrito segundo párrafo del Art. 6 de la Ley Núm. 8, *supra*, *no* procedía el dictamen emitido que dejaba en suspenso, efectivo el 15 de febrero, la referida ordenanza. En autos no hay prueba de que la Junta de Planificación, en el ejercicio de su discreción y a instancia propia, haya requerido al municipio someter su programa vehicular contenido en dicha ordenanza según provee la Ley Núm. 8, *supra*.

 Se trata de un importante trámite pautado a nivel administrativo ante la Junta de Planificación para evaluar proyectos ya establecidos como el de "San Juan Peatonal". Advertimos que la determinación de dicha junta, a su vez, está sujeta al trámite posterior de revisión judicial ante el Tribunal Superior. Todo ese trámite puede resultar en la aprobación o no —total o parcial— del proyecto sobre la reglamentación del tránsito. Máxime, ante los innumerables detalles que cubre y fija la Ordenanza Núm. 1. Basta señalar que interactúan en la seguridad peatonal y en el orden vehicular de la zona histórica de esa ciudad capital. El decreto del tribunal de instancia anuló toda esa reglamentación de dirección vehicular, peatonal, de estacionamiento y otros controles de tránsito. De resultar procedente, para evitar el

caos, su eliminación debería ser por etapas, en particular si afectan la vigencia de sus disposiciones penales.(9)

## V

 Finalmente, el Estado argumenta y nos pide que sostengamos el *injunction* con base en que "bajo las disposiciones de la Ley 374 el Municipio venía obligado a solicitar permiso para llevar a cabo todas aquellas obras y alteraciones de elementos que se realizaron en las calles y aceras del viejo San Juan como parte de la reestructuración del tránsito. La Ley Núm. 374 impedía al Municipio actuar de la manera que lo hizo, sin someter para la aprobación de las agencias correspondientes toda una serie de alteraciones físicas, como lo han sido la construcción de reatas de concreto *permanentes*, desaparición de adoquines por haberse construido sobre éstos en más de un lugar, colocación de 'materos', extensiones a las aceras y otras. La Ley Núm. 374 claramente dispone que para todas estas acciones tenía que obtenerse permiso. El *injunction* emitido por el tribunal *en cuanto al plan de tránsito* se sostiene bajo las disposiciones de la Ley 374 por sí sola". (Énfasis suplido.) Alegato del Procurador, pág. 20. Además, solicita que aclaremos que la Junta de Planificación "tiene la facultad para iniciar *motu proprio* las investigaciones que se consideren necesarias para determinar *si todas las obras* realizadas como parte del proyecto 'San Juan Abre Sus Puertas' se han llevado a cabo conforme a los propósitos y fines de las leyes aplicables, y tomar posteriormente las acciones que corresponda en ley". (Énfasis suplido.) Moción de 9 de marzo de 1988, pág. 7.

---

(9) Para ser remediadas por acción de la Asamblea Municipal advertimos que la Ley Orgánica de los Municipios exige que una vez aprobada una ordenanza, sus "disposiciones penales comenzarán a regir diez (10) días después de la publicación de las mismas en uno o más periódicos de circulación general en Puerto Rico". 21 L.P.R.A. sec. 3061(d).

Ya hemos aclarado el ámbito de la legislación preexistente. También expuesto las razones por las cuales el *injunction* en cuanto a la ordenanza sobre el tránsito es insostenible sin el trámite pautado en la Ley Núm. 8, *supra*, a nivel de la Junta de Planificación.

La decisión emitida hoy adjudica en lo necesario las cuestiones centrales del recurso. Ciertamente la misma no limita la facultad de la Junta de Planificación antes de la aprobación de la Ley Núm. 8, *supra.* Tampoco sus acciones con posterioridad a la vigencia de ese estatuto. Declinamos, por tanto, extender nuestros pronunciamientos más allá del trasfondo jurídico y fáctico del recurso. La encuesta en torno a si el Municipio de San Juan cumplió con el ordenamiento legal y obtuvo todos los permisos necesarios para otras obras relacionadas con el programa "San Juan Abre Sus Puertas" — según relacionados con el inicio de esta ponencia— no está madura ni, por ende, ante nuestra consideración. El propio Procurador General acepta que "no existe actualmente un r[é]cord apropiado siquiera para que los foros judiciales puedan pasar juicio sobre la procedencia de algunos de los proyectos en controversia. *Esto es así porque no hubo vista evidenciaria alguna en el tribunal de instancia.* No hay récord en cuanto a la existencia de los permisos. *Sólo existen alegaciones.* No está claro si el Municipio ha pedido los permisos a las agencias a las que por disposición de ley debió haberlos pedido, aunque éste alega en sus escritos que ha pedido todos los permisos y endosos correctamente". Alegato del Procurador, pág. 22.

Resumamos. En cuanto a la reglamentación sobre el tránsito establecida en la Ordenanza Núm. 1, Serie 1986–87, 0535A, si la Junta de Planificación lo estima necesario, "podrá iniciar la investigación correspondiente para determinar si la [reglamentación] de que se trata está conforme a los

propósitos y fines de [la Ley Núm. 8, *supra*]". Moción, *supra*, pág. 8. En el caso de autos no se aportó prueba sobre los permisos que se deben obtener en relación con el proyecto "San Juan Abre Sus Puertas". Sin esta prueba el *injunction* es improcedente. A tenor con el estado de derecho declarado en esta opinión, el municipio deberá someter y obtener los permisos o dispensas correspondientes. En ausencia de tales permisos o dispensas el Estado podrá, entre otros mecanismos legales, acudir al tribunal de origen el cual, al fundarse en la declaración de derechos aquí contenida, previa la aportación de la prueba necesaria, podrá dictar los remedios apropiados incluso entredicho provisional, *injunction* preliminar y permanente.

Por los fundamentos expuestos, *se dictará sentencia que modifique la del Tribunal Superior, Sala de San Juan —según aclarada en su Resolución de 14 de enero de 1988— a los fines de revocar el pronunciamiento que deja sin efecto la Ordenanza Núm. 1, Serie 1986-87, 0535A. Así modificada, como decreto declarativo será confirmada en sus restantes extremos. Se devolverá el caso al foro de instancia para trámites compatibles con lo resuelto.*