EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Municipio Autónomo de Peñuelas, Representado por el Hon. Walter Torres Maldonado, Alcalde<br><br>      Peticionario<br><br>           v.<br><br>Ecosystems, Inc.<br><br>      Recurrido | Certiorari<br><br>2016 TSPR 247<br><br>196 DPR ____ |

Número del Caso: CC-2015-325


Fecha: 19 de diciembre de 2016


Tribunal de Apelaciones:

    Región Judicial de Ponce-Humacao, Panel VIII


Abogados de la parte Peticionaria:

    Lcda. Verónica A. Pagán Torres
    Lcdo. Juan De Jesús Vélez


Abogados de la Parte Recurrida:

    Lcdo. Miguel L. Torres Torres
    Lcdo. José A. Cuevas Segarra


Materia: Derecho Constitucional: Doctrina del campo ocupado. Facultad de Municipios de regular manejo de agregado manufacturado a base de cenizas. Ley de Municipios: Forma de impugnar ordenanzas, resoluciones o acuerdos de Legislaturas Municipales o Funcionarios Muniicpales.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio Autónomo de Peñuelas,
Representado por el Hon. Walter
Torres Maldonado, Alcalde

     Peticionario

      v.                  Núm. CC-2015-0325  Certiorari

Ecosystems, Inc.

     Recurrido

Opinión del Tribunal emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico a 19 de diciembre de 2016.

En el presente caso nos corresponde determinar si el Municipio Autónomo de Peñuelas puede prohibir válidamente, mediante ordenanza municipal, el uso de material de relleno de construcción -- en específico, agregado manufacturado a base de cenizas producto de la quema de carbón por la producción de energía -- dentro de sus límites territoriales.

Adelantamos que, al examinar detenida y cuidadosamente las disposiciones legales que gobiernan el asunto, contestamos la interrogante en la afirmativa dado a que, ausente una disposición en contrario del gobierno estatal, prevalece la ordenanza municipal. Veamos.

I.

El 25 de marzo de 2013, la Oficina de Gerencia de Permisos (en adelante, "OGPe") expidió un Permiso General Consolidado (en adelante, "permiso consolidado"), junto a la Junta de Calidad Ambiental (en adelante, "JCA") a favor de Ecosystems, Inc. (en adelante, "Ecosystems" o "recurrida"), para la construcción de una facilidad de sistema de relleno sanitario en la Carretera Estatal PR-385, km. 4.4 en el Barrio Encarnación del Municipio de Peñuelas (en adelante, "Municipio" o "peticionaria"). El propósito de dicha facilidad era disponer de forma final de desperdicios sólidos no peligrosos. **El referido permiso consolidado meramente autorizaba a la construcción de un vertedero; nada disponía en cuanto a materiales de construcción o relleno a ser utilizados en dicha facilidad a ser construida**.

El 9 de abril de 2013, con vigencia a partir del 10 de abril del mismo año, la Legislatura Municipal de Peñuelas aprobó la Ordenanza Núm. 13, Serie 2012-2013 (en adelante, "la Ordenanza Municipal"), con el fin de prohibir el uso de cenizas procedente de la quema de carbón en plantas generadoras de energía, **como material de relleno o construcción**. Específicamente, la ordenanza en cuestión dispone que

> [s]e prohíbe el uso de cenizas procedentes
> de la quema de carbón, en plantas
> generadoras de energía, como material de
> relleno y su depósito sobre terrenos en los

límites territoriales del Municipio de Peñuelas. [A t]oda persona natural o jurídica que viole esta prohibición, se le impondrá una multa administrativa de $5,000.00 dólares [sic.]. *Íd.*

Dicha Ordenanza Municipal establece, además, que toda persona -- ya sea desarrollador, constructor, compañía y/o persona jurídica o natural -- que interesara realizar una construcción en el Municipio, "*presentar[á], al momento de[l] pago de los arbitrios municipales, una declaración jurada donde certificar[á] que en su proyecto no se usa[n] cenizas derivadas de la quema de carbón como material de construcción o relleno, llámese AGREMAX[1] o cualquier otro nombre comercial*". *Íd.*

Así las cosas, el 18 de junio de 2014, Ecosystems acudió ante la OGPe y la JCA, solicitando una modificación al Permiso General Consolidado previamente obtenido. A tales efectos, el 25 de junio de 2014, se expidió un nuevo permiso consolidado, mediante el cual se autorizó, entre otras cosas, la utilización de agregado manufacturado como material de relleno en la construcción. Sin embargo, a pesar de existir una prohibición en el Municipio de Peñuelas en torno al uso de material proveniente de la quema de carbón como relleno sanitario, el permiso consolidado enmendado nada dispuso en torno a materiales de construcción.

---

[1] El *Agremax* es un material que suele ser utilizado como material de construcción o relleno, proveniente de la quema de cenizas de carbón.

Más adelante, conforme a las facultades reservadas mediante los permisos expedidos, personal de la JCA inspeccionó el área de construcción de Ecosystems y advino en conocimiento de la utilización del agregado manufacturado conocido comercialmente como *Agremax* por parte de Ecosystems. A raíz de ello, el Municipio presentó una demanda en solicitud de *injunction* preliminar y permanente, mediante la cual alegó que Ecosystems se encontraba en violación de la Ordenanza Municipal al estar utilizando en su proyecto de sistema de relleno sanitario el referido producto.

Tras varios incidentes procesales no necesarios aquí pormenorizar, el Tribunal de Primera Instancia emitió una Orden de Entredicho Provisional y ordenó a Ecosystems a desistir de cualquier uso de *Agremax* en el Municipio, hasta que se dispusiera de otra forma. Posteriormente, durante la celebración de la vista de *injunction* ante dicho foro, Ecosystems presentó una solicitud de desestimación fundamentándose en que la Ordenanza Municipal era *ultra vires* y por tanto, nula. Según la contención de la recurrida, el Municipio carecía de autoridad para reglamentar el uso de *Agremax*, dado a que tal uso ha sido autorizado tanto por agencias estatales como federales. Además, Ecosystems arguyó que la vigencia de la Ordenanza tuvo el efecto de afectar sus derechos propietarios y su derecho al debido proceso de ley.

El 18 de septiembre de 2014, el Tribunal de Primera Instancia declaró Ha Lugar la demanda incoada por el Municipio y, en consecuencia, ordenó el cese y desista de la utilización de *Agremax* por parte de Ecosystems. Según concluyó el Foro Primario, la controversia era una de estricto derecho y se limitaba a establecer si el Municipio de Peñuelas poseía autoridad para aprobar la Ordenanza Municipal y qué impacto tenía sobre el permiso consolidado enmendado otorgado por la JCA y la OGPe. Luego de evaluar el expediente, el Tribunal de Primera Instancia razonó que el permiso consolidado enmendado no autorizaba expresamente el uso de *Agremax* o de agregado manufacturado a base de cenizas producto de la quema de carbón. Por esa razón, resolvió que la prohibición municipal al uso de *Agremax,* o cualquier agregado manufacturado a base de cenizas producto de la quema de carbón, era oponible a Ecosystems, pues no entraba en conflicto con lo dispuesto en el permiso consolidado enmendado emitido por la JCA y la OGPe. Para el foro primario, si bien Ecosystems puede continuar la construcción, según lo autorizado, no podrá usar agregado manufacturado a base de cenizas de la quema de carbón como material de relleno. Ese foro fundamentó su decisión en que no surge del expediente que la JCA ni la OGPe hubiesen autorizado expresamente el uso de ese material. Por último, el tribunal sentenciador determinó que la Ordenanza es una de aplicación general, que no interfiere de forma alguna con el Permiso General Consolidado expedido a favor de

Ecosystems relativo a la construcción de un sistema de relleno sanitario.

Inconforme, Ecosystems apeló la referida sentencia ante el Tribunal de Apelaciones. La recurrida solicitó que el Foro Apelativo Intermedio declarara la nulidad de la Ordenanza Municipal, basado en que el asunto relativo a la regulación del uso y disposición de residuos de combustión de carbón era uno ocupado por legislación federal. Igualmente, Ecosystems arguyó que la Ordenanza Municipal era una de aplicación específica y no general, por lo que el Municipio le violentó su derecho al debido proceso de ley al no proveer una notificación adecuada de la aprobación de la referida ordenanza.

Por su parte, el Municipio alegó que la JCA no ha regulado el uso de *Agremax* y que la Ordenanza Municipal en cuestión complementa las disposiciones regulatorias de las agencias que atienden el asunto de desperdicios sólidos. Según el Municipio, ante la ausencia de una prohibición específica en alguna ley estatal, la legislación municipal aprobada mediante la Ordenanza Municipal es válida siempre y cuando no esté en contravención con legislación estatal. Finalmente, el Municipio sostuvo que la Ordenanza Municipal es una de aplicación general, por lo que Ecosystems venía obligado a impugnar el precepto municipal dentro del término de caducidad de veinte (20) días que dispone la Ley de Municipios Autónomos, *infra*.

Evaluados los planteamientos y comparecencias de ambas partes, el Tribunal de Apelaciones dictó sentencia. Mediante la misma, revocó en su totalidad la Orden de *Injunction* Permanente emitida por el Tribunal de Primera Instancia y determinó que aunque la aplicación de la Ordenanza era una "teóricamente" general, "su efecto real es de aplicación particular a Ecosystems"[2], por lo que Ecosystems había quedado afectada por la actuación del Municipio. Por ello, el Tribunal de Apelaciones razonó que el término de caducidad de veinte (20) días para impugnar alguna actuación de un municipio, no había comenzado a transcurrir. Asimismo, el foro intermedio concluyó que el Municipio falló en demostrar la ausencia de un remedio adecuado en ley para la concesión de un *injunction* a su favor.

Insatisfecho aún, el Municipio acudió ante este Tribunal mediante recurso de *certiorari*. En síntesis, alegó que el Tribunal de Apelaciones erró al determinar que la Ordenanza Municipal era una de aplicación específica a Ecosystems y no de aplicación general, según dispuesto en el texto del referido cuerpo legislativo y según se desprende de la exposición de motivos de la misma. Además, alegó que el foro apelativo intermedio incidió al determinar que el Municipio debió haber notificado a Ecosystems por escrito y correo regular y certificado de la aprobación de la Ordenanza Municipal, con el fin de que

---

[2] *Véase*, *Sentencia del Tribunal de Apelaciones*, págs. 26-27.

comenzara a transcurrir el término de veinte (20) días dispuesto en la Ley de Municipios Autónomos, *infra*, para impugnar la aprobación de una ordenanza o acto legislativo municipal. Entiende el Municipio que, por ser de aplicación general y no específica a Ecosystems, el término para impugnar la Ordenanza comenzó a transcurrir desde la aprobación de la misma.

Por su parte, Ecosystems compareció ante nos mediante su *Alegato en Oposición a Certiorari*, mediante el cual repitió sus alegaciones en cuanto a la aplicación específica de la Ordenanza Municipal a sus operaciones. Asimismo, arguyó que el ente con la facultad para establecer los requisitos aplicables al manejo y disposición, entre otros, de desperdicios sólidos lo es la *Agencia de Protección del Medio Ambiente de los Estados Unidos* ("EPA", por sus siglas en inglés, a saber, *Environmental Protection Agency*). Por lo tanto, plantea que la Ordenanza es una nula y *ultra vires*.

Expedido el auto de *certiorari* y con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

II.

Como cuestión de umbral, y para la correcta disposición de los asuntos ante nuestra consideración, es menester atender, en primera instancia, el planteamiento relacionado a cuál es el ente encargado de establecer en Puerto Rico los requisitos aplicables al manejo y

disposición, entre otros, de los desperdicios sólidos. Es decir, debemos determinar si las agencias de la Rama Ejecutiva, la Rama Legislativa y/o los municipios del País pueden regular dicho asunto o si, por el contrario, es un campo ocupado por las agencias federales.

La doctrina de campo ocupado se ha desarrollado con el propósito de evitar conflictos regulatorios entre dos gobiernos, fomentando así una política uniforme. *González v. Mayagüez Resort & Casino*, *supra*, pág. 856; *Rivera Nat. Life Ins. Co.*, 106 DPR 517, 523 (1977). Por ello, se entiende que existe jurisdicción exclusiva del Gobierno federal sobre los asuntos de derecho federal en aquellas instancias en las que (1) **el Congreso así lo ha dispuesto expresamente**, o (2) cuando la **clara intención de la ley es privar de jurisdicción** a los tribunales estatales sobre un asunto federal. *González v. Mayagüez Resort & Casino*, *supra*, págs. 856-858; *Rodríguez v. Overseas Military*, 160 DPR 270, 277-278 (2003); *Yellow Freight System, Inc. v. Donnelly,* 494 US 820, 823 (1990). Según se puede colegir, lo fundamental será determinar cuál ha sido la intención del Congreso al legislar.

De igual forma, se entiende que hay campo ocupado o desplazado en aquellas circunstancias en las que "*cierto interés o propósito federal es tan dominante que no debe existir reglamentación estatal, o cuando la normativa estatal podría producir un resultado incompatible con los objetivos federales en determinada área*". *Rodríguez v.*

*Overseas Military*, *supra*, pág. 282, citando a *City of Burbank v. Lockheed Air Terminal*, 411 US 624, 633 (1973). Conforme a esta doctrina, cualquier ley estatal que contravenga una ley federal es nula. *Véase Franklin California Tax-Free Trust v. Puerto Rico*, 85 F.Supp.3d 577, 595 (D.P.R. 2015), citando a *Tobin v. Fed. Exp. Corp.*, 775 F.3d 448, 452 (1er Cir. 2014) y *Crosby v. Nat'l Foreign Trade Council,* 530 US 363, 372 (2000).

De conformidad con lo anterior, y pertinente a la controversia ante nuestra consideración, el Congreso de los Estados Unidos creó la Ley de Conservación y Recuperación de los Recursos de 1976, según enmendada, 42 USC secs. 6901 *et seq.*, para atender los asuntos relativos a la disposición y almacenamiento de desperdicios sólidos y peligrosos, entre otros. *Meghrig v. KFC W., Inc.*, 516 US 479, 483 (1996). Dicha legislación promueve un esquema de cooperación, mediante el cual se exhorta a las municipalidades y estados a trabajar con el gobierno federal central para desarrollar prácticas de manejo de desperdicios que faciliten la recuperación de energía de desperdicios sólidos. 42 USC sec. 6902(a)(11)[3]. *Véanse* además, *AES Puerto Rico, L.P. v. Trujillo-Panisse*, 133

---

[3] El referido artículo reza, en lo aquí pertinente, de la siguiente manera, a saber:

> The objectives of this chapter are to promote the protection of health and the environment and to conserve valuable material and energy resources by—
> […]
> **(11)** establishing a cooperative effort among the Federal, State, and local governments and private enterprise in order to recover valuable materials and energy from solid waste.

F.Supp.3d 409 (D.P.R. 2015); *Blue Circle Cement, Inc. v. Bd. of Cnty. Comm'rs of Cnty. of Rogers*, 27 F.3d 1499, 1506 (10mo Cir. 1994). Asimismo, conforme a dicho estatuto federal, la EPA fue designada como la entidad encargada de identificar qué desperdicios son tóxicos o dañinos.

Sabido es que la EPA es la agencia federal encargada de proteger la salud de los ciudadanos y el medio ambiente, ejecutando y obligando al cumplimiento de las leyes aprobadas por el Congreso de los Estados Unidos. Como ente regulador, la EPA atiende aquellos asuntos nacionales relativos al cambio climático, polución del aire y el agua, sustancias tóxicas, seguridad química, entre otros[4]. Particularmente, por delegación del Congreso mediante la Ley de Conservación y Recuperación de los Recursos de 1976, la EPA fue el ente encargado de determinar si la ceniza de carbón era un desperdicio tóxico o no.

Cónsono con lo anterior, y en lo que aquí nos atañe, el 17 de abril de 2015, la EPA promulgó una norma reglamentaria relativa a la disposición segura de residuos provenientes de combustión de carbón, a saber: *Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals from Electric Utilities*, 80 Fed.Reg. 21302 (17 de abril de 2015) (en adelante, *"Final Rule"*). Según se desprende de su propio texto, el propósito del *Final Rule* era fijar los **criterios nacionales mínimos para**

---

[4] *Véase* Agencia de Protección Ambiental de Estados Unidos, *"Los asuntos de la EPA"* (última visita, 14 de noviembre de 2016).

la disposición de residuos de combustión de carbón. *Véase*, 80 Fed.Reg. 21302-21303. Al respecto, la referida disposición reglamentaria establece que

> **The legislation is clear that these are minimum requirements only, and without preemptive effect; states may therefore impose more stringent requirements, including the requirement that CCR facilities obtain a permit.** This is also wholly consistent with longstanding EPA interpretations. See 44 FR 53438, 53439 (September 13, 1979) (``the standards established in the criteria constitute minimum requirements. These criteria do not preempt other state and federal requirements. Nothing in the Act precludes the imposition of additional obligations under authority of other laws on parties engaged in solid waste disposal.''); see also 44 FR 45066 (July 31, 1979) (``EPA establishes only 'minimum' requirements under this portion of the Act which should not prevent States from developing broader programs or stricter standards under authority of State law.''). States may also incorporate the federal requirements into state law—whether through revisions to existing legislation or regulation, or through incorporating them into any permits issued to CCR facilities. Such an approach would also resolve commenters' concerns about the potential for 'parallel and redundant regulatory programs.' (Énfasis suplido). 80 Fed.Reg. 21302.

Según se puede colegir, mediante dicha norma la EPA estableció aquellos requisitos mínimos, **sin que ello tenga el efecto de desplazar cualquier acción o reglamentación estatal.** 80 Fed.Reg. 21332. Es decir, **los estados quedan facultados para imponer requisitos más estrictos en cuanto a este asunto, incluyendo el requisito de que las facilidades dedicadas a disponer de residuos de combustión de carbón obtengan un permiso para ello.** *Íd.*

De igual forma, en cuanto a la implementación de estos criterios nacionales mínimos, el *Final Rule* expone lo siguiente:

> In order to ease implementation the regulatory requirements for CCR landfills and CCR surface impoundments, EPA strongly encourages the states to adopt at least the federal minimum criteria into their regulations. **EPA recognizes that some states have already adopted requirements that go beyond the minimum federal requirements;** for example, some states currently impose financial assurance requirements for CCR units, and require a permit for some or all of these units. This rule will not affect these state requirements. **The federal criteria promulgated today are minimum requirements and do not preclude States' from adopting more stringent requirements where they deem to be appropriate.** (Énfasis suplido). 80 Fed.Reg. 21430.

Del texto citado claramente se desprende que, en primer lugar, los estados no vienen obligados a adoptar o implementar automáticamente la norma que nos ocupa, establecida por la EPA, sino que exhorta a las jurisdicciones a acoger los requisitos mínimos esbozados. Es decir, esta determinación de la EPA **no impide que un estado adopte requisitos más estrictos, de así estimarlo necesario.** Ausente alguna disposición en contrario y según el texto íntegro del *Final Rule*, es indiscutible que un estado puede prohibir válidamente la disposición y uso de residuos de la quema de carbón por la producción de energía, dentro de sus límites territoriales.

III.

Por otro lado, paralelo a la EPA, la JCA es la agencia del Estado Libre Asociado de Puerto Rico encargada de proteger y conservar el medioambiente. *Véase* Ley Núm. 416-2004, Ley sobre Política Pública Ambiental de 2004, 12 LPRA sec. 8001 *et seq*. Este estatuto declara que será

> política continua del Gobierno del Estado Libre Asociado, **incluyendo sus municipios**, en cooperación con las organizaciones públicas y privadas interesadas, el utilizar todos los medios y medidas prácticas, incluyendo ayuda técnica y financiera, con **el propósito de alentar y promover el bienestar general** y asegurar que los sistemas naturales estén saludables y tengan la capacidad de sostener la vida en todas sus formas, así como la actividad social y económica, en el marco de una cultura de sustentabilidad, **para crear y mantener las condiciones bajo las cuales el hombre y la naturaleza puedan existir en armonía productiva** y cumplir con las necesidades sociales y económicas y cualesquiera otras que puedan surgir con las presentes y futuras generaciones de puertorriqueños. (Énfasis suplido). 12 LPRA 8001(a).

Por mandato expreso, la JCA quedó facultada para preparar y desarrollar proyectos y programas que, entre otros asuntos, atiendan lo relativo a la disposición adecuada de los desperdicios sólidos. 12 LPRA sec. 8002c. A tenor con ello, la JCA adopta las normas o reglamentos *"para la disposición de desperdicios sólidos y para fijar los sitios y métodos para la disposición de estos desperdicios"*. 12 LPRA sec. 8002c(b)(4)(A). En ese sentido, la JCA puede promulgar aquellas normas y regulaciones necesarias para establecer un método de registro, **permisos**

**y licencias para la instalación y operación** de plantas o facilidades para la recuperación, procesamiento y disposición final de desperdicios sólidos. *Véase* 12 LPRA sec. 8002c(b)(9)(B). En cuanto a este particular, el referido estatuto dispone que "los **planos para la construcción** de estas plantas o sistemas deberán ser sometidos" ante la consideración de la JCA para su correspondiente aprobación, "sin defecto de la obligación de los solicitantes de cumplir con las disposiciones de las demás leyes aplicables". *Íd*. Además, la JCA podrá emitir aquellas órdenes que estime necesarias para asegurar que la operación de estas plantas o sistemas no ocasionen daño al ambiente. *Íd*.

Conforme al *Reglamento para el control de los desperdicios sólidos peligrosos*, según enmendado, Reglamento Núm. 2863 de la JCA (en adelante, "*Reglamento Núm. 2863*"), la JCA otorga **permisos para construir y operar facilidades que se dediquen al manejo y disposición de desperdicios sólidos**. *Véase*, Parte IX, *Reglamento Núm. 2863*. Específicamente, el referido reglamento dispone que en toda circunstancia en la cual la JCA vaya a conceder un **permiso de construcción**, la agencia preparará un borrador del mismo y procederá a notificar "mediante aviso público, la oportunidad de vistas públicas, emitirá una decisión final y contestará los comentarios". *Véase* Regla I-912(E)(5), *Reglamento Núm. 2863*. Asimismo, en lo que aquí nos compete, se dispone que cuando un borrador de permiso

ha sido preparado, la JCA publicará un aviso público mediante el cual provea por lo menos cuarenta y cinco (45) días para recibir comentarios del público. Regla I-912(H)(1) y (2), respectivamente, *Reglamento Núm. 2863*. Así, la JCA queda obligada a recibir los comentarios del público en general y, a su vez, queda facultada, dentro de su discreción, para celebrar vistas públicas en aquellas circunstancias en las que exista un "interés significativo" de parte del público. Regla I-912(I) y (J), respectivamente, *Reglamento Núm. 2863.*

En cuanto al proceso de modificación de un permiso ya otorgado por la JCA, la Regla I-912 D del *Reglamento Núm. 2863*, establece, en lo aquí pertinente, que estos podrán ser modificados, revocados y re-expedidos, o terminados, a solicitud de cualquier parte o a iniciativa propia de la JCA. Ello, cuando las reglas aplicables hayan sido modificadas; los términos y condiciones del permiso se hayan violado; la modificación sea esencial para proteger la salud humana y el ambiente; ante la existencia de alguna condición de emergencia, o cuando el poseedor de un permiso "ha fallado en exponer completamente los datos relevantes en la solicitud o durante el proceso de emisión del permiso, o ha incurrido en falsa representación de cualquier hecho en cualquier momento". *Íd*.

Asimismo, la referida regla dispone que "**[c]uando se vaya a modificar un permiso, en conformidad con esta sección, sólo las condiciones a ser modificadas serán**

**reabiertas a discusión cuando se prepare el nuevo borrador de permiso".**[5] (Énfasis suplido). *Íd.* Los demás aspectos del permiso previamente otorgado quedarán en vigor hasta que termine la vigencia del mismo.

Por otra parte, la JCA promulgó el *Reglamento para el manejo de los desperdicios sólidos no peligrosos,* según enmendado, Reglamento Núm. 5717 de 14 de noviembre de 1999. Sin embargo, ningún acápite o sección del mismo define lo que es un agregado manufacturado ni dispone de forma alguna el tratamiento que deberá dársele, en lo aquí relacionado, a los diversos tipos de cenizas provenientes de la quema de carbón.

En fin, la JCA es la agencia encargada por ley para determinar la forma y manera en la que se debe instalar, operar y mantener las facilidades para la disposición final de desperdicios sólidos, por lo que aprueba los permisos de construcción de conformidad con su política pública.

IV.

Finalmente, la Ley Núm. 81-1991, conocida como Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico, 21 LPRA sec. 4001 *et seq.,* es la piedra angular de los procesos de reforma municipal iniciados a principio de la década de los noventa. *L. Santana Rabell & N. Negrón Portillo, La Reforma Municipal en Puerto Rico: Retos y*

---

[5] Si bien ello no está señalado como error en el recurso, del expediente del caso no surge claramente si se llevó a cabo o no.

*Oportunidades, 1ra Ed., Puerto Rico, Ed. Universidad de Puerto Rico, 1993, pág.14; Alcalde de Guayama v. E.L.A.,* 192 DPR 329, 335 (2015).

Dicha reforma se instrumentó con el propósito de "*iniciar un proceso de renovación político-administrativa del gobierno municipal con la finalidad de fomentar una mayor autonomía y la descentralización gubernamental de Puerto Rico*". *Íd.; Mun. De Ponce v. A.C. et al.,* 153 DPR 1, 22 (2000); *Alcalde Mun. De Humacao v. Ramos Cofresí*, 140 DPR 587, 595 (1996). Entre las metas que se contemplaron al momento de aprobar la misma, se encontraban: "*(1) la transferencia de poderes, mecanismo de descentralización de competencias del gobierno central hacia los municipios mediante el establecimiento de convenios […], (2) [l]a reforma administrativa y (3) [l]a autonomía fiscal, razón por la cual se crea el Centro de Recaudación de Ingresos Municipales*". *Municipio de Ponce v. A.C. et al.,* 153 DPR 1, 8 (2001); *Ortiz y otros v. Mun. de Lajas,* 153 DPR 744, 754 (2001).

A tenor con lo anterior, se declaró como política pública del Estado Libre Asociado de Puerto Rico, otorgar a los municipios del País el máximo posible de autonomía y proveerles a estos las herramientas financieras y los poderes y facultades necesarias para asumir un rol central y fundamental en el desarrollo urbano, social y económico de nuestro pueblo. Art. 1.002 de la Ley Núm. 81-1991; *Rivera Fernández v. Mun. Carolina*, 190 DPR 196 (2014); *The Sembler*

*Co. v. Mun. de Carolina*, 185 DPR 800, 811-12 (2012); *E.L.A. v. Crespo Torres*, 180 DPR 776, 787 (2011).

Así pues, mediante la aprobación del referido estatuto, se amplió el ámbito de facultades y funciones de los municipios, se autorizó la transferencia de competencias de planificación y reglamentación de sus territorios, y se autorizó la delegación de otras materias de la competencia del Gobierno Central. *Gobierno Ponce v. Caraballo*, 166 DPR 723, 731 (2006); *Maymi v. Gob. Mun. Aut. Ponce*, 151 DPR 689 (2000).

Asimismo, el Art. 2.004 de la Ley de Municipios Autónomos, 21 LPRA. sec. 4054, facultó a los municipios para *"ordenar, reglamentar y resolver cuando sea necesario o conveniente para atender las necesidades locales y para su mayor prosperidad y desarrollo"*. También se les facultó para crear la política, las estrategias y los planes dirigidos a **ordenar su territorio y a la conservación de sus recursos**. *Íd*. *Véase*, además, F. Figueroa Santiago, *La promesa de autonomía municipal desde la perspectiva del Tribunal Supremo de Puerto Rico*, 3 Rev. Jur. AAPR 69 (2016).

Cónsono con lo anterior, y relacionado a la controversia ante nuestra consideración, la Ley de Municipios Autónomos le confiere a cada municipio del País la facultad de *"reglamentar el manejo de desperdicios sólidos **en armonía con la política pública ambiental del Estado Libre Asociado de Puerto Rico**, disponer por ordenanza la forma en que se llevará a cabo el manejo de desperdicios sólidos e imponer*

*penalidades por violaciones a las normas que se adopten".* (Énfasis suplido). 21 LPRA sec. 4055. A tales efectos, se define el concepto de "*manejo de desperdicios sólidos*" como "*la administración y control sistemático de **todas las actividades asociadas a los desperdicios sólidos** […]".* (Énfasis suplido). *Íd.*

Así pues, salvo que otra cosa se disponga mediante ley o reglamentación, la Legislatura Municipal queda revestida del poder de aprobar aquellas ordenanzas necesarias para promover y adelantar su propia política pública, siempre y cuando la misma no contravenga la política pública establecida por el Estado. *Véase* Art. 2.005 de la Ley Núm. 81 de 30 de agosto de 1991 de Municipios Autónomos, 21 LPRA sec. 4055; *véase*, además, López, Fed. Coms. Unidos v. Mun. de San Juan, 121 DPR 75, 88 (1988) ("[T]oda ordenanza municipal regulatoria tiene que estar en armonía con el ordenamiento estatal, el cual ha de prevalecer en situaciones conflictivas".).

V.

En el presente caso, la JCA y la OGPe otorgaron un Permiso General Consolidado a favor de Ecosystems para la **construcción de un sistema de relleno sanitario.** Como señalamos anteriormente, nada se dispuso en cuanto los materiales que habrían de utilizarse en la referida construcción, ni el tipo de relleno a ser manejado por Ecosystems.

Luego de la aprobación de la Ordenanza Municipal objeto de este pleito por la Legislatura Municipal de Peñuelas, en la que se prohibió la utilización de cenizas derivadas de la quema de carbón como material de construcción o de relleno, y a solicitud de Ecosystems, la JCA y la OGPe autorizaron una enmienda al referido permiso. Sin embargo, a pesar de existir la prohibición local del uso de cenizas producto de la quema de carbón por la producción de energía, el permiso nada dispuso en torno al uso de este tipo de material de construcción. Es decir, no se autorizó expresamente el uso del material prohibido por la Ordenanza Municipal. Tampoco surge que la intención de las agencias fuese que la vigencia de su permiso no se viera afectada tangencialmente por prohibiciones locales.

Ecosystems alega que la Ordenanza Municipal aprobada por el Municipio de Peñuelas es nula y *ultra vires*, toda vez que entiende que las entidades con "*jurisdicción exclusiva*" para regular lo relativo a los desperdicios sólidos lo son la EPA y la JCA. Es la contención de la recurrida que, conforme al *Final Rule* de la EPA y el *Reglamento Núm. 2863*, el campo fue ocupado. No le asiste la razón.

En primer lugar, tal y como discutimos anteriormente, del texto claro del *Final Rule* promulgado por la EPA en 2015, leído en su totalidad, se desprende que la intención expresa de esta agencia fue establecer únicamente aquellos criterios nacionales mínimos para la disposición de

residuos de combustión de carbón. Así, explícitamente se establece que las disposiciones del *Final Rule* no impiden que un estado promulgue requisitos más exigentes que los establecidos por la EPA, según así lo considere. *Véase* 80 Fed.Reg. 21430 ("*The federal criteria promulgated today are minimum requirements and do not preclude States from adopting more stringent requirements where they deem to be appropriate.*"). Siendo ello así, no existe duda alguna en torno a la clara intención de la EPA de permitirle a los estados promulgar y adoptar aquellas regulaciones que estime necesarias para atender lo relacionado a la disposición de residuos de combustión de carbón. Nos resulta inescapable, pues, concluir que la EPA no ocupó el campo en cuanto a este asunto.

Por otra parte, Ecosystems arguye que el *Reglamento Núm. 2863* aprobado por la JCA y las subsiguientes enmiendas al mismo, tuvieron el efecto de ocupar el campo relativo a los residuos de combustión de carbón por dicha entidad administrativa. Nuevamente, no le asiste la razón.

De una lectura íntegra del Reglamento Núm. 2863, *supra*, junto a sus respectivas enmiendas, se desprende que, en esencia, el mismo se limita a atender únicamente aquellos aspectos técnicos y administrativos relativos a las actividades que se llevan a cabo en las facilidades de desperdicios sólidos. Es decir, se atiende cómo habrá de realizarse, una vez permitida la construcción de una facilidad de esta índole, el manejo, monitoreo,

almacenamiento y disposición de los desperdicios sólidos. Nada se dispone en torno al uso de materiales de construcción.

Así pues, la JCA, entidad a la cual se le concedió, entre otras, la facultad de adoptar normas o reglamentos relativos a la disposición de desperdicios sólidos y a los permisos y licencias para la instalación de facilidades para la recuperación, procesamiento y disposición final de tales desperdicios, **tampoco, al día de hoy, ha ocupado el campo, en cuanto al uso de agregado manufacturado a base de cenizas de la quema de carbón como material de construcción**. Nada impide que posteriormente, la JCA ejerza su poder de reglamentación en cuanto a este asunto y ocupe el campo expresamente.

En vista de lo anterior, el Municipio de Peñuelas está facultado para regular o prohibir el uso y manejo de agregado manufacturado a base de cenizas producto de la quema de carbón dentro de sus límites territoriales, pues no ha contravenido en forma alguna la política pública del Estado, según delineada por la JCA. *Véanse* Ley sobre Política Pública Ambiental de 2004, 12 LPRA 8001(a); Art. 2.005 de Ley de Municipios Autónomos, 21 LPRA sec. 4055; *AES Puerto Rico, L.P. v. Trujillo-Panisse*, *supra*, a la pág. 428 ("… *Puerto Rico law permits municipalities to 'regulate the solid waste collection management in harmony with the environmental policy' of the Commonwealth*").

Conforme a las disposiciones de la Ordenanza Municipal, cualquier persona o entidad jurídica queda facultada para utilizar, dentro de Peñuelas, cualquier otro tipo de material de construcción o relleno para cumplir con un plan de construcción. Tal es el caso de Ecosystems. **Su derecho a construir un vertedero o un sistema de relleno sanitario no queda afectado en modo alguno por la Ordenanza Municipal ni por la decisión que hoy pronuncia este Tribunal**. Cualquier contención en contrario no encuentra sustento alguno en derecho.

Así las cosas, en vista de lo expuesto, resolvemos que la Ordenanza Municipal aprobada por el Municipio de Peñuelas prohibiendo el uso de cenizas procedentes de la quema de carbón en plantas generadoras de energía, como material de relleno, es válida y oponible a Ecosystems, pues no contraviene en forma alguna la política pública del Estado Libre Asociado vigente ni el permiso de construcción que emitió la JCA y la OGPe.

Establecido lo anterior, solo nos resta por determinar si la referida Ordenanza Municipal es una de aplicación específica a Ecosystems, por lo cual se le debía notificar por escrito y correo regular y certificado, para que comenzara a transcurrir el término de veinte (20) días para su impugnación, o si por el contrario, era una de aplicación general. Veamos.

# VI.

Como se sabe, la Ley de Municipios Autónomos, *supra*, establece la forma en las que las ordenanzas y resoluciones del Municipio cobran eficacia. Asimismo, establece el mecanismo a incoarse en caso de que se intente revisar alguna actuación legislativa municipal. A tales efectos, el Art. 15.002 de la Ley de Municipios Autónomos dispone, en lo aquí pertinente, de la siguiente manera:

> (1) El Tribunal Superior de Puerto Rico entenderá y resolverá, con exclusividad, a instancias de la parte perjudicada, sobre los siguientes asuntos:
>
> > (a)   Revisar cualquier acto legislativo o administrativo de cualquier funcionario u organismo municipal que lesione derechos constitucionales de los querellantes o que sea contrario a las leyes de Puerto Rico.
> >
> > (b)   Suspender la ejecución de cualquier ordenanza, resolución, acuerdo u orden de la Legislatura, del Alcalde o de cualquier funcionario del municipio que lesione derechos garantizados por la Constitución del Estado Libre Asociado de Puerto Rico o por las leyes estatales.
> >
> > (c)   Compeler de cumplimiento de deberes ministeriales por los funcionarios del municipio.
> >
> > (d)   Conocer, mediante juicio ordinario, las acciones de reclamaciones de daños y perjuicios por actos u omisiones de los funcionarios o empleados del municipio por malicia, negligencia e ignorancia inexcusable.
> >
> > (e)   En los casos contemplados bajo los incisos (a) y (b) de esta sección, **la acción judicial sólo podrá instarse dentro de los veinte (20) días**

**siguientes a la fecha en que el acto legislativo o administrativo se haya realizado o que la ordenanza, resolución, acuerdo u orden se haya notificado por el Alcalde o funcionario municipal autorizado a la parte querellante por escrito mediante copia y por correo regular y certificado a menos que se disponga otra cosa por ley.** Disponiéndose que el término de veinte (20) días establecido en esta sección comenzará a decursar a partir del depósito en el correo de dicha notificación; y que la misma deberá incluir, pero sin ser limitativo, el derecho de la parte afectada a recurrir al Tribunal de Primera Instancia, Sala Superior competente; término para apelar la decisi[ó]n; fecha del archivo en auto[s] de la copia de la notificación y a partir de qu[é] fecha comenzará a transcurrir el término. 21 LPRA 4702.

Así, pues, la Ley de Municipios Autónomos, supra, establece un término de caducidad de veinte (20) días para impugnar cualquier ordenanza, resolución o acuerdo de la Legislatura municipal o de cualquier funcionario del municipio, ante el Tribunal de Primera Instancia. Tratándose de un término de caducidad, el mismo no permite interrupción, de modo que se logre impartir certeza y finalidad a las actuaciones del gobierno municipal. *Hardland Co. v. Mun. de San Juan*, 139 DPR 185, 189-190 (1995); *Acevedo v. Asamblea Mun. de San Juan*, 125 DPR 182 (1990).

Según se desprende, el transcurso del término de caducidad para impugnar tales actuaciones dependerá de si la ordenanza, resolución o acuerdo municipal es de aplicación general o específica. Si es de aplicación

general, se desprende que el término comenzará a decursar al día siguiente a la fecha de la actuación legislativa o administrativa. *Íd*. Por otra parte, cuando la ordenanza, resolución o acuerdo municipal es de aplicación específica, el término de caducidad se entiende que ha comenzado a transcurrir desde la notificación de la misma a la parte afectada por tal actuación. *Íd*.

En el presente caso, Ecosystems sostiene que la Ordenanza Municipal aprobada por el Municipio es una de aplicación individual y específica, por lo que el Municipio venía obligado a notificarle por escrito y por correo, regular y certificado, de tal actuación. Por ello, entiende que el término de caducidad de 20 días para impugnar tal acto legislativo no ha comenzado a transcurrir. Tras evaluar las disposiciones legales aplicables y el tracto procesal de este caso, resolvemos que no le asiste la razón.

Del texto de la Ordenanza Municipal se desprende explícitamente que la misma es aplicable a "*[t]odo desarrollador, constructor, compañía y/o cualquier persona jurídica o natural*" que vaya a realizar un proyecto de construcción en el Municipio o deposite relleno a base de cenizas procedentes de la quema de carbón para producir energía. *Véase*, Ordenanza Municipal, *supra*, págs. 2 y 3. Es decir, **no podemos colegir que la misma sea de aplicación exclusiva a Ecosystems.** Por el contrario, la misma aplica a cualquier compañía, presente o futura, que desee depositar

o realizar un proyecto de construcción mediante la utilización de agregado manufacturado proveniente de la quema de carbón. Disponer lo contrario sería contravenir la intención clara del legislador municipal, según quedó plasmada en el texto aprobado por la Legislatura Municipal de Peñuelas y su Alcalde.

Como cuestión de hecho, en el caso ante nuestra consideración, Ecosystems parte de la premisa errada de ostentar a su favor un derecho propietario para el uso de *Agremax,* por lo que ello automáticamente provocó que la Ordenanza Municipal fuera de aplicación específica. Nada más lejos de la verdad. Aquí, la JCA expidió un permiso de construcción a favor de Ecosystems, que nada disponía en cuanto al uso de *Agremax* en sus facilidades. Luego, el Municipio aprueba la Ordenanza Municipal que prohíbe únicamente el uso de cenizas procedentes de la quema de carbón como material de construcción o relleno en las facilidades; aceptando cualquier otro material. Es con posterioridad a la aprobación y entrada en vigencia de tal ordenanza, un año y varios meses después, que Ecosystems solicita y obtiene a su favor un permiso enmendado que tampoco lo autorizó expresamente a utilizar *Agremax* en la facilidad a construirse en Peñuelas.

Así las cosas, debido a que la Ordenanza Municipal en cuestión es de aplicación general, el término para impugnar la misma comenzó a transcurrir al día siguiente de su entrada en vigor. Debido a que transcurrió más de un año

antes de que Ecosystems impugnara la misma, el término establecido en la Ley de Municipios Autónomos, *supra*, caducó. Así, pues, se cometió el error señalado.

Precisa reiterar que lo aquí resuelto por este Tribunal no es óbice para que, de así entenderlo y conforme a los mecanismos provistos en ley, la JCA establezca la política pública del Estado Libre Asociado sobre este asunto.

VII.

Por los fundamentos expuestos, por entender que el asunto relativo al uso de cenizas procedentes de la combustión de carbón no es uno que haya sido ocupado por el gobierno federal o estatal, y que el Municipio de Peñuelas ostenta la facultad en ley para prohibir su uso dentro de sus límites territoriales, revocamos la determinación del Tribunal de Apelaciones y reinstalamos la sentencia emitida por el Tribunal de Primera Instancia.

Se dictará sentencia de conformidad.

Ángel Colón Pérez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio Autónomo de Peñuelas,
Representado por el Hon. Walter
Torres Maldonado, Alcalde

    Peticionario

      v.                  Núm. CC-2015-0325  Certiorari

Ecosystems, Inc.

    Recurrido

SENTENCIA

En San Juan, Puerto Rico a 19 de diciembre de 2016.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se resuelve que el asunto relativo al uso de cenizas procedentes de la combustión de carbón no es uno que haya sido ocupado por el gobierno federal o estatal, y que el Municipio de Peñuelas ostenta la facultad en ley para prohibir su uso dentro de sus límites territoriales. En consecuencia, se revoca la determinación del Tribunal de Apelaciones y se reinstala la sentencia emitida por el Tribunal de Primera Instancia.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez concurre con opinión escrita. La Jueza Presidenta Oronoz Rodríguez y la Jueza Asociada señora Pabón Charneco concurren sin opinión escrita. El Juez Asociado señor Kolthoff Caraballo no intervino.

Notifíquese inmediatamente por correo electrónico y posteriormente por la vía ordinaria.

                       Juan Ernesto Dávila Rivera
                  Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Municipio Autónomo de Peñuelas<br><br>Peticionaria<br><br>v.<br><br>Ecosystems, Inc.<br><br>Recurrida | CC-2015-0325 |

Opinión Concurrente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 19 de diciembre de 2016.

Estoy conteste con resolver que la Ordenanza Municipal aprobada por el Municipio Autónomo de Peñuelas –prohibiendo el uso del agregado manufacturado Agremax como material de construcción o relleno– es válida y, consecuentemente, oponible a Ecosystems, Inc. No obstante, preciso abundar sobre el contenido del Permiso General Consolidado Enmendado y puntualizar sobre ciertos eventos que no se desprenden de la opinión mayoritaria.

I

Tal y como narra la opinión mayoritaria, la presente controversia surge del Permiso General Consolidado (PGC) expedido, el 25 de marzo de 2013, por la Oficina de Gerencia de Permisos (OGPe) y la Junta de Calidad Ambiental (JCA) a favor de Ecosystems, Inc. (Ecosystems). Éste fue otorgado para la construcción de un vertedero comercial en el Barrio Encarnación del Municipio de Peñuelas (Municipio o peticionaria). De una lectura del

PGC, surge que Ecosystems no estaba autorizado a utilizar relleno en su construcción.[6]

Por su parte, la Asamblea Legislativa del Municipio aprobó la Ordenanza Núm. 13, serie 2012-2013 (Ordenanza Municipal) el 9 de abril de 2013, efectiva el día siguiente, prohibiendo el uso de cenizas procedentes de la quema de carbón de plantas generadoras de energía, específicamente Agremax, como material de relleno o construcción.

La opinión mayoritaria menciona que la construcción del vertedero fue inspeccionada por el personal de la JCA. Sin embargo, considero que es preciso pormenorizar los hallazgos y el procedimiento administrativo que surgieron de tal evento, pues, estos hechos son necesarios para la cabal comprensión del contenido de la enmienda solicitada por Ecosystems al PGC. Así, pues, el 6 de mayo de 2014, acaeció la referida inspección. Allí los ingenieros identificaron varias violaciones al PGC y al *Reglamento para el control de la erosión y prevención de la sedimentación*, Reglamento Núm. 5754 del 12 de febrero de 1998, según enmendado (RCEPS). Entre las violaciones, se encontró que Ecosystems se extralimitó de las facultades autorizadas en el PGC, al rellenar ciertas áreas para la construcción  de una vía de acceso al vertedero. Los materiales utilizados como relleno para la construcción de la carretera fueron

---

[6] En el apartado *Componentes de la corteza terrestre, Volumen total a rellenar*, el Permiso General Consolidado indica *cero metros cúbicos*.

agregado manufacturado Agremax y mogolla.[7] En consecuencia, el Oficial Examinador recomendó la imposición de una multa de $10,000.00 a Ecosystems por haber rellenado ilegalmente.[8]

En vista de ello, el 18 de junio de 2014, Ecosystems acudió ante la OGPe y la JCA, solicitando la modificación del PGC para utilizar el agregado manufacturado como relleno en las instalaciones a ser construidas. El 25 de junio de 2014, se expidió la enmienda al permiso (PGC Enmendado) autorizando el relleno para un volumen total de 70 mil metros cúbicos. La especificidad de los materiales a utilizarse como relleno lo dispuso el *Memorial Explicativo,* documento sometido por el propio Ecosystems. De éste surge que se utilizará agregado manufacturado y/o

_____

[7] Según la determinación de hecho núm. 13 del Informe del Oficial Examinador del 29 de mayo de 2014: "La señora Figueroa Andino [ingeniera que inspeccionó las instalaciones de Ecosystems] revisó las boletas de pasaje del material que se estaba utilizando para la construcción del camino de acceso al proyecto. Según la información contenida en las mismas, los materiales consistían en el agregado de cenizas de carbón conocido como 'Agremax', generado por la planta de generación de electricidad que usa carbón como combustible, Applied Energy Systems Puerto Rico, L.P., ubicada en Guayama; y mogolla de relleno de la corteza terrestre proveniente de la cantera Rita. Véase Informe del Oficial Examinador, Caso Núm. del caso núm. OA-14-RP-044-A, Junta de Calidad Ambiental, pág. 13.

[8] La Regla 1220 B del RCEPS dispone que "[n]inguna persona podrá efectuar cambio alguno a un permiso CES previamente aprobado por la Junta de Calidad Ambiental, incluyéndose todos los documentos y planos que forman parte del mismo, según radicado, sin la previa autorización de la Junta de Calidad Ambiental, excepto conforme a lo establecido en el Inciso F de la Regla 1230 de este Reglamento". Reglamento para el control de la erosión y prevención de la sedimentación, Reglamento Núm. 5754 del 12 de febrero de 1998, según enmendado, Regla 1220 (B), pág. 18.

mogolla como material de relleno.[9] Véase *Memorial Explicativo*, pág. 1.

El Municipio -tras advenir en conocimiento sobre la utilización de Agremax en el proyecto de Ecosystems – presentó, el 18 de agosto de 2014, una demanda en solicitud de un interdicto preliminar y permanente. En síntesis, alegó que Ecosystems violó la Ordenanza Municipal. Luego de varios incidentes procesales, el Tribunal de Primera Instancia (TPI) emitió una *Orden de Entredicho Provisional* y ordenó a Ecosystems a desistir de cualquier uso de Agremax en el Municipio hasta que se dispusiera de otra forma. Durante la vista, Ecosystems presentó una solicitud de desestimación fundamentándose en que la Ordenanza Municipal era ultra vires y, por tanto, nula. Esto, al entender que las entidades con "jurisdicción exclusiva" para regular lo relativo a los desperdicios sólidos lo son la Agencia para la Protección Ambiental (EPA) y la JCA. Este razonamiento se basó en que el campo fue ocupado en virtud del *Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals from Electric Utilities,* 80 Fed. Reg. 21302 y el *Reglamento para el control de los desperdicios sólidos peligrosos*, según enmendado, Reglamento Núm. 2863 de la JCA (Reglamento Núm. 2863). Además, Ecosystems arguyó que

---

[9] El *Memorial Explicativo* menciona que el volumen final de la carretera ya construida con agregado manufacturado y mogolla se estima en, aproximadamente, 35,000 metros cúbicos.

la Ordenanza afectó sus derechos propietarios y su debido proceso de ley.

Finalmente, el 18 de septiembre de 2014, el TPI declaró *con lugar* la demanda incoada por el Municipio y ordenó el cese y desista de la utilización de Agremax por parte de Ecosystems. El foro primario concluyó que la Ordenanza es de aplicación general y no interfiere de forma alguna con el Permiso General Consolidado relativo a la construcción de un vertedero.

Inconforme con tal determinación, Ecosystems apeló ante el Tribunal de Apelaciones (TA). Allí, arguyó nuevamente la nulidad de la Ordenanza Municipal y la violación a su debido proceso de ley, puesto que la aplicación del pronunciamiento municipal es específica y no general.

Por su parte, el Municipio alegó que la JCA no ha regulado el uso de Agremax por lo que la Ordenanza en cuestión es complementaria a las disposiciones regulatorias de las agencias que atienden el asunto de desperdicios sólidos. Asimismo, el Municipio alegó que la Ordenanza es válida al no contravenir la legislación estatal. Además, al ser la Ordenanza de aplicación general, Ecosystems venía obligado a impugnar el precepto municipal dentro del término de caducidad de veinte (20) días que dispone la *Ley de Municipios Autónomos*. Véase, Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico, Ley Núm. 81-1991, 21 LPRA sec. 4702.

El foro apelativo intermedio dictó una sentencia revocando en su totalidad la *Orden de Injunction Permanente* emitida por el foro primario. Además, determinó que aunque la aplicación de la Ordenanza era una "teóricamente" general, "su efecto real es de aplicación particular a Ecosystems", siendo esta última afectada. Consecuentemente, el Tribunal de Apelaciones determinó que el término de caducidad para impugnar la actuación municipal no había comenzado a transcurrir.

Aún insatisfecho, el Municipio acudió oportunamente ante este Tribunal mediante un auto de *Certiorari*. En el recurso apelativo planteó que erró el foro apelativo intermedio al concluir que la Ordenanza Municipal era de aplicación específica a Ecosystems. Tal determinación tuvo el efecto de concluir que el término de caducidad para impugnar la actuación del municipio comenzaría a transcurrir a partir de la notificación de la Ordenanza por correo a Ecosystems.

En su alegato de oposición, Ecosystems repitió sus alegaciones en cuanto a la aplicación específica la Ordenanza Municipal y nulidad de ésta.

## II

La mayoría de este tribunal atiende el efecto de la Ordenanza Municipal sobre el permiso otorgado a Ecosystems como uno limitado a la autorización para construir el vertedero comercial obviando el permiso enmendado. No obstante, soy del criterio que Ecosystems posee,

válidamente, un permiso de construcción y uso de agregado manufacturado como material de relleno. Veamos.

Como fue señalado en los hechos, el PGC nada dispuso sobre la acción de rellenar en la construcción del vertedero comercial. Posteriormente, Ecosystems solicitó una enmienda al PGC, para que se le autorizara a rellenar 70,000 metros cúbicos con material agregado manufacturado y/o mogolla.

No debemos pasar por alto que tal enmienda fue aprobada por las agencias pertinentes y –que hasta el momento– está vigente. Ecosystems, por lo tanto, posee una autorización válida para utilizar en su construcción el agregado manufacturado y/o mogolla como material de relleno. Por otra parte, es necesario mencionar que es norma reiterada que los procesos administrativos están revestidos de una presunción de corrección y regularidad. *González Segarra v. CFSE*, 188 DPR 257, 277 (2013); *Calderón v. CFSE*, 181 DPR 386 (2011); *Junta de Planificación v. Cordero Badillo*, 177 DPR 177 (2009).

Ahora bien, debo aclarar que, coincido con el análisis de la opinión mayoritaria respecto a que el Municipio de Peñuelas está facultado para regular el manejo de desperdicios sólidos y, en vista de que no existe reglamentación federal o estatal relacionada al uso de las cenizas como material agregado para relleno, es válida la Ordenanza Municipal. No obstante, este Tribunal debió precisar la siguiente controversia: ¿cuál es el

efecto de la Ordenanza Municipal en el permiso que autoriza a Ecosystem a utilizar el agregado manufacturado como material de relleno en la construcción del vertedero comercial? Para aclarar esto, como cuestión de umbral, es menester clarificar qué es un agregado manufacturado y cómo se cataloga el producto Agremax.

Los agregados, al igual que los materiales de construcción en general, son considerados "componentes importantes de una infraestructura".[10] Actualmente, existen agregados naturales y agregados reciclados. Las principales fuentes de agregados naturales son las rocas, la arena y la grava.[11] Sin embargo, ante el exponencial desarrollo urbanístico y el impacto ambiental que produce las excesivas extracciones de estos recursos naturales, se han desarrollado agregados que, mediante la manufactura, se confeccionan del reciclaje de materiales como: los escombros de las demoliciones de estructuras, del pavimento removido y, en lo pertinente a este caso, las cenizas provenientes de la quema de carbón.[12]

Por su parte, el Agremax es un producto manufacturado por AES Puerto Rico, empresa que lo describe como un material de relleno compuesto por materiales reciclados, entiéndase, las cenizas

---

[10] D. Wilburn & T. Goonan, "Aggregates from Natural and Recycled Sources: Economic Assessments for Construction Applications", Structure of the Aggregates Industry, 1998, pág. 3, http://cimentquebec.com/wp/wp-content/uploads/2011/12/Recycled-Aggregates-Study.pdf (última visita 14 de diciembre de 2016).
[11] *Id.*
[12] *Id.*

provenientes de la combustión de carbón.[13] En vista de lo antes discutido, queda claro que el Agremax es un tipo de agregado manufacturado.

Así, pues, retomando el lenguaje del PGC Enmendado, es innegable que la autorización para rellenar con agregado manufacturado se emitió en la acepción genérica o amplia del concepto, por lo que, potencialmente, incluiría material de relleno proveniente de las cenizas. Ahora bien, para cumplir con la reglamentación municipal, Ecosystems tiene que cerciorarse que el material agregado que utilizará sea uno permitido en el Municipio de Peñuelas. Como vimos, la Ordenanza Municipal únicamente prohíbe un producto dentro de la gama de agregados manufacturados existentes, a saber, las provenientes de las cenizas.[14]

Con esto en mente, es forzoso concluir que la Ordenanza Municipal no incide en el ejercicio de Ecosystems de rellenar con agregado manufacturado. Es decir, Ecosystems puede utilizar cualquier agregado manufacturado como material de relleno, siempre y cuando no sea el agregado proveniente de cenizas de la quema de carbón, llámese Agremax o cualquier otro nombre comercial, dentro de los límites geográficos del Municipio de Peñuelas. De esta forma, procuramos *ante estos hechos*,

---

[13] Agremax, AES Puerto Rico, http://aespuertorico.com/productos/ (última visita 12 de diciembre de 2016).

[14] Según la Ordenanza Municipal, se prohíbe el uso de "cenizas derivadas de la quema de carbón como material de construcción o relleno, llámese AGREMAX o con cualquier otro nombre comercial".

armonizar las facultades de reglamentación del Municipio con el poder de razón del Estado, como mandata la *Ley de Municipios Autónomos*.[15]

**III**

En vista de lo anterior, concurro con la opinión mayoritaria que emite este Tribunal.

Anabelle Rodríguez Rodríguez
Juez Asociada

_____

[15] Hacemos la salvedad, al igual que lo hace la Opinión del Tribunal, que la Junta de Calidad Ambiental puede, como asunto de política pública del Estado, regular el uso de agregados incluyendo las cenizas provenientes de la quema de carbón. La determinación que tome la Junta sobre este particular, necesariamente, debe prevalecer sobre los dictámenes municipales. Lo contrario sería darle paso a la balcanización del Estado.