# United States Court of Appeals
## For the First Circuit

No. 16-2052

AES PUERTO RICO, L.P.,

Plaintiff, Appellant,

v.

MARCELO TRUJILLO-PANISSE, in his Official Capacity as Mayor of
the Municipality of Humacao; MUNICIPALITY OF HUMACAO; WALTER
TORRES-MALDONADO, in his Official Capacity as Mayor of the
Municipality of Peñuelas; MUNICIPALITY OF PEÑUELAS,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Torruella, Lipez, and Barron,
Circuit Judges.

Peter D. Keisler, with whom Ricardo L. Ortiz-Colón, Fiddler
González & Rodríguez, P.S.C., David T. Buente, Samuel B. Boxerman,
Paul J. Zidlicky, Christopher A. Eiswerth, and Sidley Austin LLP
were on brief, for appellant.
Francisco José Medina-Medina, with whom Pedro E. Ortiz-
Álvarez, LLC was on brief, for appellees.
John F. Cooney, Douglas H. Green, Margaret K. Fawal, and
Venable LLP on brief for amici curiae the Utility Solid Waste
Activities Group and the American Coal Ash Association.

May 16, 2017

**LIPEZ**, **Circuit Judge**.  This case requires us to decide whether two Puerto Rico municipalities may prohibit the beneficial use and disposal of coal ash at landfills within their borders even though a state agency has authorized such activities at those particular landfills.  Appellant AES Puerto Rico, L.P. ("AES-PR"), a coal-fired power plant owner, claims that the two municipal ordinances banning the approved handling of "coal combustion residuals" ("CCRs") are preempted by federal and Commonwealth law and also violate various provisions of the United States and Puerto Rico constitutions.  The district court granted summary judgment for the municipalities on AES's federal claims and declined to exercise jurisdiction over the Commonwealth claims.

After careful review, we conclude that the local ordinances may not be enforced to the extent they directly conflict with Commonwealth law as promulgated by the Puerto Rico Environmental Quality Board ("EQB").  Hence, we reverse the summary judgment in favor of the municipalities and remand with directions to the district court to enter judgment for AES-PR based on its claim of Commonwealth law preemption.

**I.**

We begin by examining the legal framework that governs the disposal of CCRs in Puerto Rico.  That multi-tiered scheme consists of (1) federal law, specifically, the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901-

6992k; (2) the Commonwealth's Environmental Public Policy Act, P.R. Laws Ann. tit. 12, §§ 8001-8007f, the source of the EQB's authority; and (3) the Autonomous Municipalities Act, P.R. Laws Ann. tit. 21, §§ 4001-4008, 4051-4058, the source of the municipalities' authority. We briefly describe each in turn, as pertinent to our analysis.

## A. Federal Law: RCRA

Congress enacted RCRA, "a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste," based, inter alia, on its finding that waste disposal had become a national problem requiring federal involvement. Meghrig v. KFC W., Inc., 516 U.S. 479, 483 (1996); see 42 U.S.C. § 6901(a)(4); 42 U.S.C. § 6901(a)(2) (noting the "rising tide of scrap, discarded, and waste materials"). Despite the perceived need for federal action, however, Congress affirmed in RCRA that "the collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies." Id. § 6901(a)(4). Hence, RCRA anticipates that federal, state, and local governments will work cooperatively to ensure the safe and environmentally appropriate management of solid waste, and the statute's objectives expressly include establishment of "a viable Federal-State partnership" to "promote the protection of health and the environment and to conserve valuable material and energy resources." Id. § 6902(a)(7), (a).

This cooperative approach applies both to "hazardous wastes" under RCRA subtitle C, id. §§ 6921-6939g, and to nonhazardous solid waste under RCRA subtitle D, id. §§ 6941-6949a. See City of Chicago v. Envtl. Def. Fund, 511 U.S. 328, 331 (1994). The federal Environmental Protection Agency ("EPA") has classified CCRs as nonhazardous waste, see 40 C.F.R. § 261.4(b)(4)(i), and, accordingly, they are regulated under subtitle D.[1] With respect to such materials, Congress sought to promote methods of disposal

_____

[1] In a May 2000 Regulatory Determination, the EPA reaffirmed its earlier conclusion that coal combustion wastes should not be regulated as hazardous waste and "decided that it is appropriate to establish national regulations under non-hazardous waste authorities for coal combustion wastes that are disposed in landfills and surface impoundments." Notice of Regulatory Determination on Wastes from the Combustion of Fossil Fuels, 65 Fed. Reg. 32,214, 32,221, 32,229 (May 22, 2000), 2000 WL 642307. However, the EPA also stated that regulation was "not warranted" for most of the beneficial uses of coal combustion wastes, such as waste stabilization and use in construction products. Id. at 32,214, 32,221.

Ten years later, the EPA announced that it was again considering whether to regulate CCRs under subtitle C "when they are destined for disposal in landfills or surface impoundments," or to "regulate disposal of such materials under subtitle D of RCRA by issuing national minimum criteria." Hazardous and Solid Waste Management System; Identification and Listing of Special Wastes; Disposal of Coal Combustion Residuals From Electric Utilities, 75 Fed. Reg. 35,128 (June 21, 2010), 2010 WL 2470432. The EPA expected to continue excluding most beneficial uses of CCRs from hazardous waste regulation, however, noting that they "offer significant environmental benefits." Id. at 35,154.

In April 2015, EPA settled on the subtitle D classification for coal combustion waste, and it set national minimum criteria for landfills receiving CCRs for disposal. Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals from Electric Utilities ("2015 Rule"), 80 Fed. Reg. 21,302 (Apr. 17, 2015), 2015 WL 1734632. Beneficial uses remained excluded from regulation. Id. at 21,309.

that are "environmentally sound" and maximize the reuse of recoverable resources. 42 U.S.C. § 6941. To advance those objectives, states and regional authorities are provided technical and financial assistance to develop and implement solid waste disposal plans, consistent with federal guidelines, to be submitted for EPA approval. Id. §§ 6941, 6943, 6946-47. Among other requirements, the state plans must "prohibit the establishment of new open dumps within the State," and require that solid waste either be used for resource recovery, disposed of in sanitary landfills, "or otherwise disposed of in an environmentally sound manner." Id. § 6943(a)(2). Congress directed the EPA to adopt "regulations containing criteria for determining which facilities shall be classified as sanitary landfills," and, under those criteria, "a facility may be classified as a sanitary landfill . . . only if there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility." Id. § 6944(a).

The Commonwealth's plan to regulate the disposal of non-hazardous solid waste at landfills, approved by the EPA in 1994, gives the EQB "authority and responsibility for implementing and enforcing solid waste management regulations, including a permit program, inspection authority and enforcement activities." 59 Fed. Reg. 44,144, 44,145-46 (Aug. 26, 1994), 1994 WL 460341. The

EPA notice approving Puerto Rico's program stated that the EQB had adopted comprehensive regulations governing waste disposal "intended to bring Puerto Rico into full conformity" with federal specifications, id. at 44,145, and that Puerto Rico's application showed compliance with "all of the statutory and regulatory requirements established by RCRA," id. at 44,146. The Commonwealth was thus "granted a determination of adequacy for all portions of its municipal solid waste permit program." Id.[2]

## B. Commonwealth Law: Environmental Public Policy Act

The Environmental Public Policy Act of 2004 designates the EQB as the agency charged with managing Puerto Rico's response to federal laws pertaining to "environmental conservation, natural resources, solid waste, and other matters" related to environmental quality. P.R. Laws Ann. tit. 12, § 8002g. Among other functions, the statute authorizes the EQB to (1) "adopt, promulgate, amend and repeal rules and regulations for solid waste

---

[2] The EPA approval was for Puerto Rico's "municipal solid waste permit program," 59 Fed. Reg. 44,144, and the regulation establishing minimum national criteria likewise refers specifically to "municipal solid waste landfill (MSWLF) units," 40 C.F.R. § 258.1. Although the parties and district court refer to the landfills at issue in this case as "sanitary" landfills, rather than MSWLFs, the EQB's authorization for placement of CCRs is based on the landfills' compliance with "the design and operation criteria laid down in Title 40, Part 258 of the Code of Federal Regulations under Subtitle D of the RCRA and [Puerto Rico regulations]." EQB Resolution No. 14-27-20, Sept. 2, 2014, at 13. Hence, our analysis presumes the sanitary landfills in this case are equivalent to MSWLFs.

disposal and establish the sites and methods to dispose of such solid waste," id. § 8002c(b)(4)(A); (2) "adopt rules and regulations to establish a permit-awarding and licensing mechanism that regulates the control of the pollution in the air and water and by solid waste and noise," id. § 8002c(b)(3)(E); and (3) issue orders "that, in its judgment, are necessary to achieve the purposes of [the Act] and the regulations promulgated thereunder," id. § 8002c(a)(8).

Under its statutory authority, the EQB adopted State Regulation No. 5717, which consists of a series of rules governing the management of non-hazardous solid waste. See P.R. Envtl. Laws & Regs. No. 5717 ("the 1997 Regulation"). The 1997 Regulation's purposes include "[t]o establish a program for the design, construction, operation, closure and post-closure maintenance of [sanitary landfills] for non-hazardous solid waste." The Rules specify, for example, where such facilities may be located (Rule 540), design criteria (Rule 541), the minimum personnel and their training (Rules 543, 544), and the need for a system of ground water protection and monitoring (Rules 551-558).

A "final resolution or decision" of the EQB is reviewable "in the manner provided for in the Puerto Rico Uniform Administrative Procedures Act," and EQB decisions may not be "stayed, unless so ordered by the Circuit Court of Appeals of Puerto Rico or by the Governing Board [of the EQB] itself." P.R.

- 7 -

Laws Ann. tit. 12, § 8002c(a)(8); see also id. § 8002f(a)(4) (providing that "[a]ny person adversely affected by a resolution, order or decision of the Governing Board [of the EQB] may request the latter to reconsider its determination or request a review by the Court of Appeals of Puerto Rico"). Individuals who fail to comply with EQB resolutions or orders "shall be guilty of a misdemeanor," id. § 8002j(a), and may be subject to criminal or administrative fines, damages, and sanctions, id. §§ 8002j(a)-(c).

## C. Local Authority: Autonomous Municipalities Act

Puerto Rico's Autonomous Municipalities Act gives local governments authority to exercise their "legislative and executive powers in any matter of a municipal nature" to promote "the welfare of the community and its economic, social and cultural development" and to protect "the health and safety of the people." P.R. Laws Ann. tit. 21, § 4051(o). A separate provision vests municipalities with "the powers that are necessary and convenient to carry out" some twenty-odd functions, id. § 4054, including to "[e]stablish solid waste collection services and programs and public sanitation programs in general, and adopt the standards and measures that are necessary for the improvement and adequate control and disposal of waste," id. § 4054(a). This municipal authority is "subject to applicable legislation," id. § 4051(o), and "subordinate[] to the Constitution of the Commonwealth of Puerto Rico and to its laws," id. § 4003. The required compatibility of local and commonwealth

law also is recognized in a provision that authorizes municipalities to adopt ordinances regulating "solid waste collection management," stating that such measures must be "in harmony with the environmental public policy of the Commonwealth of Puerto Rico."  Id. § 4055.

**II.**

We now sketch the background of the dispute before us, drawing liberally from the district court's well-crafted summary. The facts set forth here are undisputed.

**A. Factual Background**

**1. AES-PR and the Placement of CCRs**

AES-PR's coal-fired power plant, located in Guayama, produces approximately fifteen percent of the electricity used in Puerto Rico.  The Guayama facility imports the coal from Colombia and, pursuant to a long-term contract, AES-PR sells the electricity generated at the plant to the Puerto Rico Electric Power Authority ("PREPA").

The combustion of coal produces two types of ash: bottom ash and fly ash, which are collectively labeled coal combustion residuals, and referred to as CCRs.  AES-PR produces approximately 200,000 to 250,000 tons of CCRs each year, some of which it uses in a manufactured aggregate product marketed in Puerto Rico under

the trade name AGREMAX ("Agremax").[3] According to AES-PR, Agremax has various beneficial uses, including as "structural fill" for building construction and as "subbase material in road construction." Agremax also has waste treatment applications; it can be used to solidify liquid waste,[4] or be placed each day on top of solid waste in a landfill -- a use known as "daily cover" -- to prevent the waste materials from spreading. In the latter role, Agremax substitutes for soil and other natural materials. See 40 C.F.R. § 258.21(a) (stating that sanitary landfills "must cover disposed solid waste with six inches of earthen material at the end of each operating day, or at more frequent intervals if necessary, to control disease vectors, fires, odors, blowing litter, and scavenging"); id. § 258.21(b) (allowing the "Director of an approved State" to approve "[a]lternative materials" for daily cover).

In September 2014, the EQB Board of Governors issued Resolution No. 14-27-20 ("the 2014 Resolution") authorizing disposal of CCRs generated by AES-PR's coal plant at sanitary landfills approved by the EQB that meet the design and operation requirements of RCRA's subtitle D and the Commonwealth's 1997

---

[3] Agremax is produced from a mixture of CCRs and water; the mixture is compressed and allowed to cure, during which time it hardens into what is generically called "rock ash."

[4] Federal law places a number of restrictions on the disposal of liquid waste in sanitary landfills. See 40 C.F.R. § 258.28.

Regulation. Before a sanitary landfill may begin receiving CCRs for disposal, however, it must file an application to modify its operation permit and submit a plan that, at a minimum, includes "adequate methods to control the material particles and compact the waste; a description of the safety and protection equipment of the operators and employees of the facility; a detailed description of the runoff control system; and a description of the groundwater monitoring plan." The 2014 Resolution similarly limits the use of CCRs as daily cover to approved sanitary landfills that meet the specified requirements, and it likewise requires submission of an application with an amended operation and emergency plan as a prerequisite for such use.

AES-PR has contracts with the operators of three landfills in Puerto Rico -- Peñuelas Valley Landfill and Ecosystems Peñuelas Landfill in Peñuelas, and El Coquí Landfill in Humacao -- to provide CCRs, including Agremax, for use as daily cover, or to solidify non-hazardous liquid waste, or for disposal. All three landfills are lined, sanitary landfill systems designed to meet RCRA and EQB specifications. They were issued permits by the EQB to operate as facilities for the final disposal of non-hazardous solid waste.

In October 2015, the EQB Board issued Resolution No. 15-23-1 ("the 2015 Resolution") approving requests by the El Coquí and Peñuelas Valley landfills to receive CCRs generated by AES-

PR.  Specifically, the EQB approved the use of Agremax to solidify liquid waste in the Peñuelas Valley Landfill and reaffirmed its prior authorization for the use of other CCRs at that landfill for the same purpose.  The EQB also approved disposal of CCRs, including Agremax, in both landfills.  The 2015 Resolution further advised the landfills that, if they wished to use Agremax for daily cover, they needed to apply for a waiver from the EQB by following the procedures specified in the 1997 Regulation.[5]  Several months later, in January 2016, the EQB also authorized disposal of CCRs, including Agremax, in the Ecosystems Peñuelas Landfill, and it similarly directed Ecosystems to follow the procedures specified by Puerto Rico law if it sought approval for using CCRs for daily cover.  Ecosystems' permit did not authorize liquid waste solidification with CCRs "because the necessary facilities for these purposes have not been built."

### 2.  The Humacao and Peñuelas Ordinances

More than two years before the EQB issued its 2015 Resolution, the Municipality of Peñuelas adopted Ordinance Number 13 (the "Peñuelas Ordinance"), and several months later, the Municipality of Humacao adopted Ordinance Number 21 (the "Humacao

---

[5] The Resolution notes that the Humacao landfill's 2013 Operation Plan "listed the materials that the facility would petition for in a future request for a waiver as materials proposed as alternate cover."  Among the materials listed was "Rock Ash from the AES generation plant."  However, no request for a waiver had been submitted at the time the Resolution was issued.

Ordinance"), both of which prohibit the placement of CCRs on the ground within the boundaries of their municipalities, including in sanitary landfills.[6]  Although the ordinances do not prohibit all uses of CCRs, they bar the disposal and uses that the EQB has authorized for the El Coquí, Peñuelas, and Ecosystems landfills because those activities involve depositing CCRs on the ground.[7]

Both ordinances reflect particular concern about the activities of AES-PR and its disposal of the coal ash produced by

---

[6] The Peñuelas ordinance provides, in pertinent part, that "[t]he use of ashes coming from the burning of coal, in energy generating plants, as landfill material and its depositing on lands within the territorial limits of the Municipality of Peñuelas is forbidden."

The Humacao ordinance prohibits "[a]ny kind of use of the ash derived from coal combustion in electric power generating plants . . . as filler material, whether to level the terrain, for landfills, or in any other kind of filler."  Despite the Humacao ordinance's focus on the use of CCRs as "filler material," the municipality's administrator testified in his deposition that the measure prohibits CCRs from being deposited within the geographical boundaries of Humacao.  In addition, defendants' motion for summary judgment states that the ordinances ban "the depositing of said CCRs on the ground within the geographical limits of the Municipalities in question."  Although the breadth of the prohibition does not affect the outcome of this appeal, we accept the defendants' characterization for purposes of our analysis.  Cf. AES Puerto Rico, L.P. v. Trujillo-Panisse, 199 F. Supp. 3d 492, 512 (D.P.R. 2016) (noting that the ordinances "allow CCRs to be bought, sold, and transported in the municipalities so long as they are not deposited on the ground in the process").

[7] Indeed, appellees do not argue -- and did not argue below -- that their ordinances do not apply to the specific uses of CCRs authorized by the EQB in those landfills.  Although appellees note that the ordinances do not "pose a complete ban on the use of CCRs," the uses contemplated by the EQB resolution -- disposal, alternative daily cover, and waste solidification -- are not among

- 13 -

its coal-fired power plant. In background explanatory clauses, the ordinances discuss AES-PR's extensive use of coal ash in Puerto Rico, making explicit reference to Agremax. Both ordinances cite studies revealing unsafe levels of toxic substances associated with coal ash deposits and conclude that such deposits present a threat to the environment and human health.[8]

In accordance with the EQB Resolution, AES-PR delivered Agremax and CCRs in other forms to the landfills.[9] In April 2016, the Municipality of Humacao responded by fining El Coquí Landfill for the "[u]se of ash from burning coal." On the same day, Humacao's mayor sent the landfill a letter asking it to "refrain

---

those uses that appellees claim the ordinances permit. Nor did appellees argue in their summary judgment briefing that the ordinances' prohibition on "depositing of . . . CCRs on the ground" excludes the three EQB-authorized uses of CCRs.

[8] The Humacao ordinance states that "[d]epositing such ash represents a threat to the environment and the health of people exposed thereto when it is blown by the wind or when it runs off into surface and/or underground water." The Peñuelas ordinance similarly states:

> The deposit of ashes as landfill creates toxic substances situations blown by the wind and breathed by its inhabitants, which would entail the suffering of breathing ailments, possible birth defects and a high percentage in the pollution of surface and subterranean water due to the runoff of rain and leaching to the aquifers.

[9] Although AES-PR had previously been depositing CCRs in the landfills in Humacao and Peñuelas, we focus in this case on its activities following the EQB's 2015 Resolution.

from receiving coal combustion products or ash . . . regardless of how such products are being used or under what name you are receiving it," and stating that the municipality would be "forced to reconsider" its contractual relationship with the facility if the practice did not stop. The maintenance manager of the AES-PR plant reported in an affidavit that, also in April 2016, the Municipality of Peñuelas "used municipal trucks and other municipal equipment to physically block the entrance to the Peñuelas Valley Landfill to prevent the tanker trucks from delivering AES-PR's CCRs to the Landfill for use to solidify liquid wastes."

## B. Procedural Background

In its complaint against the municipalities of Peñuelas and Humacao and their mayors, AES-PR asserted that the ordinances restricting the placement of CCRs violate both federal and Commonwealth law. Among other contentions, AES-PR argued that the local laws are preempted by both federal and Commonwealth law because they prohibit activities involving CCRs that are permitted by RCRA and explicitly authorized by the EQB.[10] The company alleged that its "coal combustion products have repeatedly been tested and

---

[10] AES-PR's complaint also alleges violations of the federal Commerce Clause, the Due Process Clauses of the United States and Puerto Rico constitutions, and the federal and Puerto Rico Contracts Clauses. The complaint further asserts that the ordinances are void and ultra vires under Puerto Rico law.

found safe for many applications, including as daily cover for solid waste landfills, in construction as structural fill, and as subbase material in road construction." AES-PR's complaint sought declaratory and injunctive relief, as well as damages.

In May 2015, AES-PR moved for partial summary judgment on its federal and state preemption claims. The district court denied the motion, rejecting both preemption theories.[11] The court held that RCRA does not preempt the ordinances because the federal law does not indicate a preference for "one type of beneficial use (such as daily cover) over any other," and the defendants "have not completely banned CCRs within their boundaries; they simply have banned one of several possible methods of use or disposal." AES Puerto Rico, L.P. v. Trujillo-Panisse, 133 F. Supp. 3d 409, 426 (D.P.R. 2015) ("AES-PR I"). With respect to Commonwealth law, the court "decline[d] to strike down the Ordinances as out of 'harmony' with Commonwealth law, particularly because Commonwealth law permits both the EQB and municipalities to regulate in this arena." Id. at 429.

In March 2016, after the close of discovery, AES-PR again moved for partial summary judgment. The company renewed its argument that the municipal ordinances were preempted by

---

[11] The court also denied defendants' motion for judgment on the pleadings, which raised issues of standing, ripeness, and timeliness. That ruling is not before us.

Commonwealth law, relying in part on the EQB's 2015 Resolution authorizing the use and disposal of CCRs at the El Coquí and Peñuelas Valley landfills -- which the EQB had issued shortly after the district court's prior ruling. AES-PR also sought summary judgment under the federal Commerce Clause because the ordinances "discriminate against products -- CCRs, including Agremax -- derived from imported coal" and improperly burden interstate and foreign commerce in excess of "any putative local benefits." In a cross-motion, the defendants sought summary judgment on AES-PR's federal claims and dismissal of any remaining Commonwealth law claims.

In its second Opinion and Order, the district court reaffirmed its previous denial of summary judgment for AES-PR on the federal preemption claim and granted summary judgment for defendants on that claim, noting that AES-PR had not alleged any changes in federal law that would affect the court's analysis. AES Puerto Rico, L.P. v. Trujillo-Panisse, 199 F. Supp. 3d 492, 506, 519 (D.P.R. 2016) ("AES-PR II").[12] On the Commonwealth preemption claim, the court reviewed the provisions of the Autonomous Municipalities Act giving municipalities the general authority to take actions to protect "the health and safety of the people," P.R. Laws Ann. tit. 21, § 4051(o), as well as those

---

[12] As noted above, AES-PR had not renewed its request for summary judgment based on federal preemption.

- 17 -

specifically authorizing municipalities to adopt "measures that are necessary for [the improvement] and adequate control and disposal of waste," id. § 4054(a) (alteration in original). See AES-PR II, 199 F. Supp. 3d at 506. The court recognized that municipal ordinances must give way to Commonwealth law when there is a conflict, but observed that "[a] municipal ordinance that regulates in the same area as a Commonwealth law . . . will not be preempted 'unless it is impossible to harmonize it with the [Commonwealth] law.'" Id. at 506-07 (second alteration in original) (quoting Lopez v. Mun. de San Juan, 21 P.R. Offic. Trans. 71, 84 (1988)).

The court, however, declined to make the conflict assessment concerning the Humacao and Peñuelas ordinances. It noted that "[t]he Puerto Rico Supreme Court has not . . . resolved whether resolutions of executive agencies carry the same power to preempt as laws passed by the Puerto Rico Legislative Assembly," id. at 508, and it viewed that question under the Supremacy Clause of the Commonwealth constitution as "a novel and complex issue of state law," id. at 509. Comparing the issue to federal preemption, the court observed that "the preemptive power" of federal agency actions "depends on a myriad of factors and is a developing area of jurisprudence." Id. at 508 & n.14 (citing cases). Describing the Puerto Rico Uniform Administrative Procedures Act as similar to the federal Administrative Procedures Act, the court concluded

that the preemptive force of the EQB actions at issue in this case is thus a question of Puerto Rico constitutional law "best resolved by the Puerto Rico Supreme Court." Id. at 508-09.[13] Accordingly, the court declined to exercise jurisdiction over the Commonwealth preemption claim.[14]

The court also rejected AES-PR's claim under the Commerce Clause, concluding that the ordinances do not discriminate facially or in effect against out-of-state products. Id. at 512. Although recognizing that the CCRS are derived from imported coal, the court noted that "the Ordinances focus on CCRs, which are produced domestically at the Guayama plant, not on the imported coal used to create CCRs." Id. In any event, the court observed, "[w]hether focusing on coal or CCRs, the burden of the

_____

[13] The court also noted that "several of the Commonwealth law issues presented are already being litigated in related cases in Commonwealth courts." AES-PR II, 199 F. Supp. 3d at 519. In one of those actions, the Municipality of Peñuelas sued Ecosystems, Inc. seeking to enjoin the use of Agremax in the construction of the Ecosystems Peñuelas Landfill. The resolution of that action is discussed infra. In another civil action that was later withdrawn, the Municipality of Humacao sought "a permanent cease and desist order against the deposit of ash" in the El Coquí landfill.

[14] Although the court observed that "[d]istrict courts may certify a question of state law to the state's supreme court when the state issue is determinative and there is no controlling precedent from the state court on the issue," it opted instead to decline jurisdiction. 199 F. Supp. 3d at 509.

Humacao and Peñuelas Ordinances on interstate commerce is either nonexistent or slight." Id. at 514.[15]

On appeal, AES-PR challenges the district court's rulings on both the federal and Puerto Rico preemption claims, as well as on the federal Commerce Clause claim. The company asserts that the ordinances "conflict with and frustrate the full implementation of Congress's goals" in RCRA and likewise conflict with the Commonwealth's environmental public policy as enacted through EQB resolutions. The company further argues that, even if the Commonwealth preemption claim raises a novel or complex issue of Puerto Rico law, the court should have certified the question to the Puerto Rico Supreme Court rather than dismissing the claim. AES-PR also seeks reversal of the district court's Commerce Clause ruling.

### III.

We review de novo the district court's resolution of the parties' cross-motions for summary judgment, Troiano v. Aetna Life Ins. Co., 844 F.3d 35, 41-42 (1st Cir. 2016), and we may affirm based on any ground supported by the record, id. at 42. In this

---

[15] The court went on to consider, and ruled in favor of defendants, on AES-PR's federal Contract Clause and due process claims. 199 F. Supp. 3d at 514-18. As with the Commonwealth preemption claim, it declined to exercise supplemental jurisdiction over the remaining Commonwealth claims, "specifically the Puerto Rico ultra vires, Contract Clause, and Due Process Clause claims." Id. at 519.

- 20 -

instance, we have an advantage over the district court because of a decision issued by the Puerto Rico Supreme Court after the district court's ruling.  See Autonomous Mun. of Peñuelas v. Ecosystems, Inc., No. CC-2015-0325, Dec. 19, 2016, Certified Translation ("Ecosystems").  As we shall explain, that recent precedent confirms our reading of Puerto Rico's statutory framework governing solid waste management, bolstering our conclusion that the Humacao and Peñuelas ordinances are preempted under Commonwealth law to the extent they bar uses of CCRs that have been specifically approved by the EQB.  Resolving the Commonwealth preemption claim in favor of AES-PR makes it unnecessary for us to address AES-PR's other arguments on appeal, and we thus limit our discussion to that claim.[16]

---

[16] We recognize that the district court declined to exercise jurisdiction over the Commonwealth preemption claim, a judgment that ordinarily is subject to review only for abuse of discretion. See, e.g., Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 191 (1st Cir. 2011).  However, the court's decision to dismiss that claim was premised on its view that the preemptive force of EQB resolutions was an unresolved issue of law.  To the extent there was uncertainty, we believe it was eliminated by the recent Ecosystems decision.  Hence, the court's rationale is no longer sustainable as a matter of law and, indeed, the court indicated that, absent the ongoing Commonwealth proceedings and the legal uncertainty, it would have exercised supplemental jurisdiction. See AES-PR II, 199 F. Supp. 3d at 519 (noting that "the advanced stage of the litigation and the costs of translating documents into English weigh in favor of the Court exercising supplemental jurisdiction").  We thus consider the Commonwealth preemption issue de novo -- like any other legal question raised on appeal. See Highmark Inc. v. Allcare Health Mgmt. Sys., Inc., 134 S. Ct. 1744, 1748 (2014) ("Traditionally, decisions on 'questions of law' are 'reviewable de novo,' decisions on 'questions of fact' are

- 21 -

## A. The Statutory Framework

As described above, Puerto Rico law envisions a collaboration between Commonwealth and local authorities in dealing with solid waste. See, e.g., P.R. Laws Ann. tit. 21, § 4055. However, in the case of a conflict, the statutory scheme explicitly recognizes the preeminence of Commonwealth law. Id. (stating that municipal measures concerning solid waste management must be "in harmony with the environmental public policy of the Commonwealth of Puerto Rico"); see also Liberty Cablevision of P.R., Inc. v. Mun. of Caguas, 417 F.3d 216, 221-22 (1st Cir. 2005) (noting that municipalities exercise only those powers derived from the state, and, thus, "every municipal ordinance must be in harmony with [state] government law, which shall prevail in conflicting situations" (alteration in original) (quoting Lopez, 21 P.R. Offic. Trans. at 84)); see also P.R. Laws Ann. tit. 21, § 4003 (stating that "[t]he municipality is the juridical entity of local government, subordinated to the Constitution of the Commonwealth of Puerto Rico and to its laws"); id. § 4051(o)

---

'reviewable for clear error,' and decisions on 'matters of discretion' are 'reviewable for "abuse of discretion."'" (quoting Pierce v. Underwood, 487 U.S. 552, 558 (1988))); see also, e.g., Smith v. Holder, 627 F.3d 427, 433 (1st Cir. 2010) (concluding that a decision "based on legal error" was an abuse of discretion).

(stating that municipal authority is "subject to applicable [Commonwealth] legislation").

The district court recognized this legislated hierarchy, but it questioned whether EQB resolutions carry the force of law such that an EQB permit allowing disposal of CCRs in a sanitary landfill would necessarily supersede a local ordinance prohibiting that disposal. See AES-PR II, 199 F. Supp. 3d at 508 ("The Puerto Rico Supreme Court has not . . . resolved whether resolutions of executive agencies carry the same power to preempt as laws passed by the Puerto Rico Legislative Assembly."). The court acknowledged, however, that if EQB resolutions and landfill permits authorized thereunder "carry the full force of law, then the municipal Ordinances would likely be preempted to the extent that they conflict." Id. As we have recounted, the district court declined to delve into the legal force of the EQB authorizations at issue in this case. See id. at 509.

Unlike the district court, we find that the governing statutes are themselves revealing on the role played by EQB resolutions in establishing Commonwealth law. As an initial matter, the EQB is given the overall authority for the Commonwealth's compliance with RCRA, see P.R. Laws Ann. tit. 12, § 8002g, and it has express authority to adopt "rules and regulations for solid waste disposal" and "establish the sites and methods to dispose of such solid waste," id. § 8002c(b)(4)(A). In

- 23 -

other words, the Commonwealth's law on solid waste management is made by the EQB.

Moreover, the "final resolution[s] or decision[s]" of the EQB's Governing Board are treated as decisive under Commonwealth law, subject only to review by the courts. Id. § 8002c(a)(8). By statute, EQB decisions may not be "stayed, unless so ordered by the Circuit Court of Appeals of Puerto Rico or by the [EQB Board] itself." Id.; see also id. § 8002f(a)(4) (providing that "[a]ny person adversely affected by a resolution, order or decision of the Governing Board [of the EQB] may request the latter to reconsider its determination or request a review by the Court of Appeals of Puerto Rico"). As further evidence that EQB decisions carry the full force of law -- including resolutions such as the one authorizing use and disposal of CCRs at the Peñuelas and Humacao landfills -- there are sanctions imposed for failure to comply with the agency's rulings. Individuals who fail to comply with any EQB "resolution, order or agreement . . . shall be guilty of a misdemeanor," and also may be subject to criminal or administrative fines, damages, and sanctions. Id. §§ 8002j(a)-(c) (emphasis added).

In our view, these provisions (1) assigning responsibility to the EQB for Puerto Rico's policy on solid waste disposal, (2) limiting any review of EQB decisions to judicial actions, and (3) imposing criminal consequences for failure to

- 24 -

comply with EQB directives definitively establish final EQB decisions on solid waste as Commonwealth law with preemptive power over local ordinances. These provisions are explicitly comprehensive in their scope, giving the force of law not only to generally applicable rules and regulations, but also to "any resolution, order or agreement dictated by the Board." Id. § 8002j(a).

We are all the more persuaded of this view in light of the Puerto Rico Supreme Court's recent Ecosystems decision, in which both a majority opinion and concurrence address the preemptive effect of EQB decisions on matters relating to the handling of solid waste -- and, specifically, on the use of CCRs. We thus turn to that decision.

## B. The Ecosystems Opinion

In the Ecosystems case, the Municipality of Peñuelas sought to enjoin Ecosystems, Inc. from using Agremax as filler material in the construction of its sanitary landfill. Ecosystems, Inc. had been granted a construction permit by Puerto Rico's Office of Permit Management and the EQB to build the facility, but the permit did not specify the materials to be used in the project. See Ecosystems Majority Op., at 2 ("Ecosystems Op."). Following enactment of the Peñuelas ordinance banning the deposit of CCRs in the municipality, Ecosystems, Inc. obtained an amended permit "authorizing, among other things, the use of manufactured

- 25 -

aggregate as filling material in the construction." Id. at 3. The amended permit, however, did not reference or approve any particular type of aggregate fill material. Id. The Municipality thus maintained that it could bar the use of Agremax pursuant to its ordinance because that prohibition did not conflict with the EQB's generally worded authorization. See Ecosystems Concurring Op. at 8 ("Concurring Op.") (noting that manufactured aggregates may be created from "rubble from demolition of buildings" and "removed pavement," as well as from coal ash).

In a lengthy analysis, the Puerto Rico Supreme Court first took up the question of which entity is "in charge of establishing in Puerto Rico the requirements applicable to the handling and disposal of . . . solid waste," Ecosystems Op. at 8-9, and it reviewed the missions of the three levels of government that share responsibility for setting the environmental agenda in the Commonwealth, id. at 9-20. Noting that the EPA's 2015 Rule established only "minimum national criteria to dispose of coal combustion residuals," id. at 11-12 (emphasis omitted), the court observed that "states may impose stricter requirements in relation to this matter," id. at 12 (emphasis omitted); see also id. at 13 ("[I]t is undeniable that a state may validly prohibit the disposal and use of residuals from the burning of coal for energy production within its territorial limits.").

The court then considered the role of the EQB. It noted that the agency is authorized "[b]y express mandate" to "deal with matters related to adequate disposal of solid waste," id. at 14 (citing P.R. Laws Ann., tit. 12, § 8002c), including by means of "orders that it may deem necessary to make sure that the operation of these plants or systems does not harm the environment," id. at 15. After reviewing EQB regulations governing solid waste, the court summed up: "In short, [EQB] is the agency in charge of determining the form and manner in which to install, operate and maintain facilities for the final disposal of solid waste, for which it approves construction permits in accordance with its public policy." Id. at 17.

Turning to the role of municipalities, the court noted that the Commonwealth's public policy is to give municipalities "as much autonomy as possible and provide them with the financial tools and necessary powers and faculties to assume a central and fundamental role in the urban, social and economic development of our country." Id. at 18. These powers, the court stated, include "provid[ing] by way of ordinance the way in which the handling of solid waste shall be carried out." Id. at 19 (citing P.R. Laws Ann. tit. 21, § 4055) (emphasis omitted). However, the court also recognized that municipal power is subject to a higher authority, and a municipality cannot "promote and further its own public policy" if that policy conflicts with Commonwealth law. See id.

- 27 -

at 20 (stating that a municipality may not act "in contravention with the public policy established by the State" (citing López, 21 P.R. Offic. Trans. at 84)).

The court then addressed the specific case before it, observing that the amended EQB permit issued for the Ecosystems landfill did not "expressly authorize[]" the use of CCRs in the construction. Id. at 21. Rather, as noted above, "the authorization to fill with manufactured aggregate was issued in the generic or broad definition of the term," Concurring Op. at 9, meaning that it covered both Agremax and aggregate manufactured from materials other than coal ash. The court also pointed out that the permit did not purport to override "local prohibitions." Ecosystems Op., at 21. In addition, the court observed that neither the EPA nor the EQB had imposed rules governing the use of CCRs as construction materials. Id. at 22-23. Hence, although the EQB permit theoretically authorized the use of Agremax in the landfill construction -- as one type of "manufactured aggregate" -- neither the permit nor any other applicable law specifically addressed or approved the use of Agremax in the construction project. The court thus identified no federal or Commonwealth law in direct conflict with the Peñuelas ordinance.

Accordingly, the court concluded that the ordinance's prohibition of coal ash as fill material could be enforced against Ecosystems, Inc. Id. at 24. That conclusion rested, however, on

the court's determination that the EQB "at present has not preempted the field as to the use of aggregate manufactured from ash produced while burning coal as construction material." Id. at 23 (emphasis omitted). Importantly, the court recognized that the EQB could accomplish preemption: "Nothing prevents the [EQB] from, in the future, exercising its regulatory power as to this matter and expressly preempting the field." Id. Indeed, the court reiterated near the conclusion of its opinion "that what is decided herein by this Court does not prevent the [EQB] from establishing public policy for the Commonwealth of Puerto Rico as to this matter, if it deems appropriate and in accordance with the legally provided mechanisms." Id. at 29. A concurring opinion emphasized the same point:

> We clarify, as done in the Court Opinion, that the [EQB] may, as a matter of public policy of the State, regulate the use of aggregates including the ash produced when burning coal. The decision taken by the Board as to this matter shall necessarily prevail over municipal decisions. Otherwise, this would lead to balkanization of the State.

Concurring Op. at 10 n.10.

The two opinions leave no doubt that this preemptive force attaches to EQB resolutions addressing specific circumstances, as well as to the agency's more broadly based regulations. Both opinions focus on the EQB-approved construction permit for the Peñuelas Valley landfill construction project. The

majority notes that, even as amended after the Peñuelas ordinance was enacted, "the permit did not state anything as to the use of this type of construction material [CCRs]. That is, the material prohibited by the Municipal Ordinance was not expressly authorized." Ecosystems Op. at 21. From this observation, we think it a fair and obvious inference that, if the permit had expressly authorized the use of CCRs, the municipal ordinance could not have overruled the EQB. Indeed, later in their opinion, the majority confirmed that the ordinance's enforceability would be precluded by conflicting EQB action, including in a permit, when they explained that the ordinance was enforceable against Ecosystems, Inc. "as it does not in any way violate the current public policy of the Commonwealth of Puerto Rico or the construction permit issued by the [EQB and Permit Office]." Id. at 24 (emphasis added).

The concurring member of the court likewise treated the EQB permit as authoritative, noting that the amended permit issued to Ecosystems, Inc. "was approved by the appropriate agencies and that -- for the moment -- it is in effect." Concurring Op. at 7; see also id. (observing that "it is a well-known rule that administrative proceedings are assumed to be correct and in accordance with regulations"). And, like the majority, the concurring justice saw room for the Peñuelas ordinance alongside federal and Commonwealth law because the amended Ecosystems permit

- 30 -

authorized the use of manufactured aggregate generically, id. at 9, and the municipal ordinance could properly supplement the permit in the absence of "federal or state regulations related to the use of ash as aggregate material for fill," id. at 7.  Hence, she observed, Ecosystems, Inc. could use any manufactured aggregate "as long as it is not aggregate from ash produced by burning coal" -- a ruling that "sought to harmonize the regulatory faculties of the Municipality with the State's reasoning power, as mandated by the Autonomous Municipality Act."  Id. at 9-10.

In this case, the question is whether EQB resolutions and permits that explicitly approve particular uses for CCRs preempt contrary municipal ordinances.  Based on the foregoing discussion, we must conclude that they do.  In contrast to the broad, generic language of the construction permit at issue in the Ecosystems case, the EQB's 2015 Resolution provides, inter alia, that "[t]he use of rock ash [i.e., Agremax] is authorized as a material for the solidification process at the Peñuelas [landfill] in addition to the use of the CCR, which has been already authorized."  The Resolution also gives explicit permission "to include the CCR and rock ash in the list of non-hazardous solid waste that may be disposed of at the Peñuelas [landfill] and Humacao [landfill]."  The Resolution further contemplates the use of rock ash as alternative daily cover at the two landfills, subject to the EQB's approval of a petition for a waiver.

- 31 -

Ecosystems Peñuelas Landfill's operating permit likewise explicitly identifies CCRs among the types of non-hazardous solid waste "to be received for disposal" at the facility. Appellees do not contend that the terms "CCR" or "rock ash," as used in the EQB resolutions here, are generic in the same way that the term "manufactured aggregate" was held to be in Ecosystems. Nor do they counter AES's argument that Ecosystems conclusively established that EQB resolutions can have preemptive effect. Hence, in the words of the Ecosystems concurrence, "[t]he decision taken by the [EQB] as to this matter shall necessarily prevail over municipal decisions." Id. at 10 n.10.

**IV.**

In sum, the EQB's authorization for particular uses and disposal of CCRs in the Humacao landfill and the two Peñuelas landfills preempts the bar on any such uses and disposal imposed by the challenged municipal ordinances. According to the record before us, the EQB has authorized (1) disposal of CCRs at all three landfills, and (2) the use of CCRs, including Agremax, for solidification at the Peñuelas Valley Landfill. Further, the EQB has invited requests for waivers to allow the use of Agremax as alternative daily cover at the three landfills.

Thus, to the extent AES-PR has complied with all regulatory prerequisites for the deposit of CCRs at the three landfills and obtained the EQB's approval to move forward, it is

entitled to do so.  Accordingly, we vacate the summary judgment in favor of the defendants, and remand the case to the district court with directions that it enter judgment for AES-PR consistent with this decision.  Each party shall bear its own costs.

**<u>So ordered.</u>**